Juhi S. Aggarwal, OSB No. 130764
jaggarwal@oregonlawcenter.org
Ellen Johnson, OSB No. 802785
eljohnson@oregonlawcenter.org
Michael Pijanowski, OSB No. 004426
mpijanowski@oregonlawcenter.org
Edward Johnson, OSB No. 965737
ejohnson@oregonlawcenter.org
OREGON LAW CENTER
230 NE 2nd Ave., Suite F
Hillsboro, OR 97124
(503) 640-4115

Of Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| LILY HILBURN,<br>LISA MCFALLS,<br>MICHAEL MCFALLS,<br>FRED WOODRING, and<br>COMMUNITY ACTION RESOURCE<br>ENTERPRISES, INC., an Oregon not-<br>for-profit organization,<br><br>                    Plaintiffs,<br><br>   v.<br><br>THOMAS VILSACK, Secretary of the<br>Department of Agriculture;<br>LISA MENSAH, Undersecretary for<br>Rural Development;<br>TONY HERNANDEZ, Administrator<br>Rural Housing Service;<br>VICKI L. WALKER, Oregon Rural<br>Development State Director;<br>GAYLORD GEORGE & VICKY<br>SHIVELEY REVOCABLE TRUST; and<br>VICKY F. SHIVELEY, Trustee,<br><br>                   Defendants. | Case No. _____<br><br><br>COMPLAINT<br><br>14th Amendment to U.S. Constitution,<br>5 USC §706(1) and (2),<br>24 U.S.C. 3601, et seq. |

1.      Individual plaintiffs are very low-income renters who live in federally subsidized housing in Tillamook, Oregon, at the Golden Eagle II apartment building (Golden Eagle II). Golden Eagle II is a 32-unit Section 515 rental project that is financed and deeply subsidized by defendant Rural Development (RD).[1] RD's unlawful actions are threatening plaintiffs' federal benefits, including tenant protections, and will result in the loss of Plaintiffs' homes as a subsidized housing project.

2.      RD has approved the request of the defendant owner and operator of Golden Eagle II, the George Gaylord & Vicky Shiveley Trust (Shiveley Trust), to prepay the loan that financed the construction of Golden Eagle II. Prepayment of the loan would occur as part of a sale to a third party buyer. RD intends to process the prepayment on or after November 18, 2016.

3.      RD's prepayment approval was granted in violation of federal law intended to preserve Section 515 rental housing and to protect its residents from displacement and in violation of plaintiffs' statutory and Constitutional due process rights. RD's actions also contravene its obligations to Affirmatively Further Fair Housing under the Fair Housing Act.[2]

4.      Tillamook County Community Action Resource Enterprises, Inc. (CARE), organizational plaintiff, relies upon the few subsidized housing projects in Tillamook County as a resource for its low-income clients who need access to safe, decent, sanitary and affordable housing. Affordable housing, let alone subsidized rental housing projects, is already scarce in

---

[1] The Rural Housing Service (RHS) is the agency within the U.S. Department of Agriculture (USDA) that is vested with responsibility for administering the rural housing programs authorized by Title V of the Housing Act of 1949. (codified at 42 U.S.C. § 1471 *et. seq.*). Notwithstanding, all the rural housing programs, including the Section 515 rental housing program, are administered in all the states by Rural Development (RD), a USDA mission area. References throughout this complaint are made to RD instead of RHS or USDA to avoid confusion.
[2] 42 U.S.C. 3608(d)

Tillamook. Loss of another subsidized building would exacerbate the unavailability of affordable housing for low-income Oregonians and particularly for CARE's clients.

5. Plaintiffs seek injunctive and declaratory relief to ensure that before Golden Eagle II is removed from the Section 515 program by the loan prepayment, federal defendants extend to plaintiffs all the protections that Congress intended.

## JURISDICTION AND VENUE

6. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, 1343(a) (3) and (4), and 1361, in that plaintiffs' claims arise under the Fourteenth Amendment to the Constitution of the United States, the Administrative Procedure Act, and the Amendments to the Fair Housing Act. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

7. Venue is proper pursuant to 28 U.S.C. § 1391 because at least one defendant is a resident of this District and a substantial part of the events, acts or omissions giving rise to plaintiffs' claims occurred here.

## PARTIES

8. Plaintiff Lily Hilburn is a very low-income resident of Golden Eagle II who pays $227 per month for a one-bedroom apartment under the terms of a written rental agreement which began in 2015 and has been renewed annually since. She receives Rental Assistance, an RD rental subsidy, which reduces her portion of the rent to 30% of her income. Ms. Hilburn is 77 years old and her sole source of income is Social Security Retirement of $791 per month.

9. Plaintiffs Michael and Lisa McFall are very low-income married residents of Golden Eagle II who pay $220 per month for a two-bedroom apartment under the terms of a written rental agreement which began in March 2015 and has been renewed annually since. Prior to March 2015, they lived in a studio apartment owned by the Shiveley Trust for

approximately one year. They receive Rental Assistance. Mr. and Mrs. McFall are aged 40 and

37 respectively, and both have disabilities. Their sole source of income is Mr. McFall's Social

Security Disability Income of $733 per month.

10.     Plaintiff Fred Woodring is a very low-income resident of Golden Eagle II who

pays $220 per month for a studio apartment under the terms of a written rental agreement that

began in March 2013 and has been renewed annually since.  He receives Rental Assistance.

When he initially moved in, Mr. Woodring did not receive Rental Assistance.  He paid $530 per

month in rent; approximately 43% of his income.  He was on the waitlist for Rental Assistance

for twenty months before he was approved.  His primary source of income is Social Security

Supplemental Security Income of $733 per month.

11.     Plaintiff Tillamook County Community Action Resource Enterprises, Inc.

(CARE) is a non-profit service agency based in Tillamook, Oregon; its mission is to ease the

effects of poverty in the county by providing housing, emergency, and limited financial

assistance services to low-income households in the county. CARE's client population includes

racial and ethnic minorities.  CARE relies upon local subsidized housing projects, including

Golden Eagle II, as a resource for its clients who need access to safe, decent, sanitary and

affordable housing.  Loss of a building's subsidy diverts CARE's limited financial and staff

resources to provide additional assistance to that building's resident households and to attempt to

place other households in more expensive market rate housing.  RD's removal of Golden Eagle

II from a subsidized status will frustrate the group's mission.

12.     Defendant Thomas Vilsack, the Secretary of the United States Department of

Agriculture (USDA), is statutorily vested with the authority to operate the rural housing

programs authorized by Title V of the Housing Act of 1949, 42 U.S.C. §§ 1471 et. seq. Defendant Vilsack is sued in his official capacity.

13. Defendant Lisa Mensah is the Under-Secretary for Rural Development. The rural housing programs are administered and overseen by the RD mission area of USDA. Defendant Mensah is sued in her official capacity.

14. Defendant Tony Hernandez is the Administrator of the Rural Housing Service (RHS), and is responsible for the day-to-day administration of USDA rural housing programs at the national level. Mr. Hernandez also has the title of RD Administrator of Housing and Community Facilities Programs. Defendant Hernandez is sued in his official capacity.

15. Defendant Vicky Walker is the RD State Director for Oregon. She is responsible for the day-to-day administration of the RD housing programs in Oregon. On information and belief, Ms. Walker, or a RD employee under her direction and control, oversees the operation of Golden Eagle II and is responsible for processing prepayment requests submitted from Oregon owners of RD-financed rental housing. Defendant Walker is sued in her official capacity.

16. On information and belief, Defendant George Gaylord & Vicky Shiveley Trust (Shiveley Trust) is the owner of Golden Eagle II. Defendant Shiveley Trust is joined in this case as a Necessary Party under Fed. R. Civ. P. 19(a).

17. On information and belief, Defendant Vicky Shiveley is the sole current trustee of the Shiveley Trust and manages day-to-day business for Golden Eagle II. She is a resident of Tillamook, Oregon. Defendant Shiveley is joined in this case as a Necessary Party under Fed. R. Civ. P. 19(a).

## FACTS

**A.    Golden Eagle II loan and subsidy history.**

18.     Golden Eagle II is a 32-unit development located in the City of Tillamook, Tillamook County, Oregon, that is financed by USDA under Section 515 of the Housing Act of 1949, 42 USC § 1485. Occupancy is limited to persons of low and moderate income. 7 C.F.R. 3560.152.

19.     Golden Eagle II has twelve studio apartments, twelve one-bedroom apartments and eight two-bedroom apartments. One of these units is occupied by an on-site manager.

20.     Twelve units are rented to tenants at reduced rents under the RHS Interest Credit program authorized by 42 U.S.C. § 1490a(a)(1) (B). Minimum rents for these units, called the 'basic rent,' are set by unit size by adding the cost of operating the development and amortizing the RD loan at 1% interest. Residents in these units pay the higher of the basic rent or 30% of their income. Monthly rents for these units at Golden Eagle II range from $530 to $915.

21.     Nineteen of the thirty-one rental units at Golden Eagle II are deeply subsidized under the RD Rental Assistance program authorized by Section 521 of the Housing Act of 1949, allowing the tenants of to pay 30% of their income for shelter, which includes rent and utilities. 42 U.S.C. § 1490a(2)(A); *see* 7 C.F.R. § 3560.11. Individual plaintiffs each receive Rental Assistance and their monthly rents range from $220 to $227.

22.     The USDA loan for Golden Eagle II was entered on February 27, 1976, for a term of 50 years, with the final loan payment scheduled for February 27, 2026. The original borrowers were George Gaylord Shiveley and Millie Shiveley. On information and belief, ownership has subsequently been transferred to defendant Shiveley Trust, of which Vicky Shiveley is the sole trustee.

**B.      USDA loan prepayment statutory history.**

23.     Any mortgage payment that retires a USDA mortgage prior to its original maturity date is a "prepayment." 7 C.F.R. §3560.11.  It is then subject to the prepayment restrictions of 42 U.S.C. § 1472(c) and RD regulations codified at 7 C.F.R. Part 3560, Subpart N.

24.     Prior to 1987, there were no restrictions limiting the rights of Section 515 project owners to prepay their mortgages and leave the program. Responding to increased prepayments of Section 515 loans in the early to middle 1980s and the negative impact of those prepayments had on residents – severely increased rents and displacement due to loss of rental subsidies – Congress enacted detailed legislation to preserve Section 515 projects as affordable housing by restricting the loan prepayment rights of owners who had entered Section 515 loans before December 21, 1979. The Emergency Low Income Housing Preservation Act of 1987, P.L. 100-242 (Feb. 5, 1988) (ELIHPA).  The rural provisions of this act, as amended in 1992, are now codified at 42 U.S.C. § 1472(c).

**C.      Statutory and regulatory procedure for a pre-1979 prepayment request.**

25.     Within 30 days of receiving a complete prepayment request, RD must notify the residents of the development about the owner's request to prepay the loan.  7 C.F.R. § 3560.654.

26.     Once a complete prepayment request has been submitted, RD has 60 days to determine the eligibility of the loan for prepayment and whether the borrower has or will comply with applicable prepayment laws and regulations.  If the owner's prepayment request meets these and other requirements, RD must offer incentives to the owner to remain in the program. 42 U.S.C. § 1472(c)(3) and 7 C.F.R. § 3560.653(e).

27.     If the owner rejects the incentives, RD must determine whether the prepayment will materially affect housing opportunities of minorities in the project, on the waiting list or in

the market area. 42 U.S.C. § 1472(c)(5)(G)(ii)7 C.F.R. 3560.658(b).  In doing so, RD is required, at a minimum:

1) to consider the percentage of minorities residing in the project and the percentage of minorities residing in the projects in the market area where displaced tenants are most likely to move;

2) to consider the impact of prepayment on minority residents in the project and in the market area;

3) to determine whether displaced minority tenants will be forced to move to other low-income housing in areas not convenient to their places of employment, to areas with a concentrated minority population and/or to areas with a concentration of substandard housing;

4) to determine the vacancy trends and number of potential minority tenants on the waiting list at the project being prepaid and at other projects in the market area that night attract minority tenants; and

5) to determine the impact prepayment will have on the opportunity for minorities residing in substandard housing in the market area to have comparable decent, safe and affordable housing, as is offered by the project being prepaid.

RD Handbook 3-3560, Chapter 15.22.

28.     If RD determines that prepayment will materially affect housing opportunities of minorities, the owner must, for 180 days, offer to sell the development at its market value to a nonprofit or public agency which would maintain the development's affordability.  42 U.S.C. §§ 1972(c)(5)(A) and 1972(c)(5)(G).

29.     If there is no material effect on minority housing opportunities, RD must then determine if there is adequate comparable alternative housing in the community to which the current residents of the development can relocate.  If adequate comparable affordable housing is available, the owner is free to prepay the loan.  If RD determines that there is not adequate comparable alternative housing, the owner can only prepay the loan subject to use restrictions that protect the current residents as long as they choose to live in the development.  42 U.S.C. § 1472(c)(5)(A) and 7 C.F.R.§ 3560.658(b)(3).

30.     Sample use restrictions that RD may impose on owners to protect current residents are set out in RD Handbook 3-3560, Att. 15-E-2, by statutory reference only.  Under the use restrictions, rents, other charges, and conditions of occupancy should be set so that the existing residents will continue to be treated as if project remained in the Section 515 program. *Id.* ¶ (4).  Not specifically mentioned in these sample use restrictions are tenant protections currently required by 7 C.F.R. 3560.156(18).

31.     42 U.S.C. § 1471(g) obligates RD to administer its programs, such as the Section 515 program, "consistent with program goals and objectives, so that the involuntary displacement of families and businesses is avoided."

32.     42 U.S.C. 3601, et seq., obligates RD to provide fair housing and not to discriminate in the conduct of the housing programs each operates.  RD is therefore obligated to administer its programs, activities and decisions related to housing and urban development in a manner which affirmatively furthers fair housing. In addition, RD is required to make affirmative efforts to overcome the effects of conditions that resulted in limiting housing opportunities for

minority individuals. 42 U.S.C. §3608(d), Executive Orders 110638 and 12892, *see* RD

Instructions 2000-GGG, Ex. A, ¶ 3 (Jan. 7, 1998).[3]

33.     RD has not promulgated guidance and instructions for staff regarding the

implementation of its obligation to affirmatively further fair housing in its programs, guidance

and methods of administration. As a result, RD lacks approval criteria for prepayment requests

that ensure the approval affirmatively furthers fair housing, regardless of whether the approval

criteria conform to other statutory anti-discriminatory provisions.

34.     RD has promulgated guidance and instructions for staff regarding the

implementation and integration of environmental justice and socioeconomic considerations into

all Agency programs' environmental reviews pursuant to Executive Order 12898. RD Instruction

1970-E § 1970.202 (g); RD Instruction 2006-P, "Civil Rights Impact Analysis," (issued on

September 18, 2002).  This guidance does not incorporate the obligation to affirmatively further

fair housing.

35.     Under RD authorizing statutes and regulations, once a loan is prepaid all subsidies

that reduce the rents to residents, including Interest Credit and Rental Assistance, cease. 42

U.S.C. §§ 1490a(a)(1)(B) and 1490a(2)(A); *see* 7 C.F.R. § 3560.11.

**D.     RD's deficient prepayment impact analysis.**

36.     Defendants Shiveley Trust and Vicky Shiveley submitted an application to RD on

or about May 27, 2015, to prepay the loan before its maturity date.

37.     On or about June 22, 2015, RD advised Golden Eagle II residents that the loan

will be prepaid ahead of its original maturity date but did not advise them of an opportunity to

appeal the agency's decision regarding prepayment.

---

[3] Available at http://www.rd.usda.gov/files/2000ggg.pdf.

38.     On or about November 20, 2015, RD conducted a Civil Rights Impact Analysis (CRIA), using RD Form 2006-38 (July 2007), concerning the prepayment of Golden Eagle II. In that analysis, RD calculated that 10% of Golden Eagle II households are minorities after noting that three out of thirty households occupying the project were classified as Hispanic households. Two of the eight applicant households on the waiting list as of November 2015 were classified by RD as Hispanic but were not included in the CRIA calculation.  Had waitlisted households been included in the calculation, the percentage of minority households living in the project and on the wait list would have been 13%.

39.     RD did not identify in the CRIA whether other, not Hispanic, minority households live in Golden Eagle II or are on its waiting list. RD did not distinguish whether the Golden Eagle II minority residents were very low income recipients of Rental Assistance or low income Interest Credit recipients. RD also did not identify the number of individuals within the affected area whose median household income is at or below Department of Health and Human Services poverty guidelines. RD additionally incorrectly calculated the percentage of minority individuals in the county by merely adding the percentage of Hispanic people to the percentage of non-white people.

40.     Golden Eagle II is within three miles of the largest employment centers in the county:  Tillamook Creamery, Fred Meyer, Adventist Hospital, and the County of Tillamook. The next largest employer, Tillamook Smoker, is 8 miles away.  RD failed to consider any impact of prepayment on the employment opportunities of low-income minority households within the area.

41.     RD ended the CRIA analysis by comparing non-equivalent categories.  It concluded there would not be a disproportionate adverse impact on minority housing

opportunities because the percentage of low-income minority *households* living at Golden Eagle II was less than the percentage of minority *individuals* at any income within the county. RD did not consider the impact prepayment would have on the minority housing opportunities of low-income minorities who would qualify to live at Golden Eagle II by virtue of their low-income within the census tract, within the city, or within the county.

42.     The Oregon Department of Human Services has determined that Golden Eagle II is located within a census tract with a population that is 24% minority and 35% in poverty, while the county population as a whole is 16% poverty and 14% minority. [4] 45% of the residents of this census tract are renters while 17% of the county population are renters. Within the county as a whole, 45.7% of Hispanics, 33.9% of the African-Americans and 26.7% of the Native Americans within the county are in poverty. [5]

42.     On information and belief, the owners of Golden Eagle II, including defendants Shiveley and Shiveley Trust, did not adopt or engage in all requirements of an Affirmative Fair Housing Marketing Plan. 7 C.F.R. § 3560.104(b). Because of inadequate marketing and advertisements directed to potential minority applicants within or immediately adjacent to the area, the number of minority households or persons currently residing at Golden Eagle II is substantially less than the minority population in the census tract in which it is located or the county.

43.     RD did not adequately review and supervise the Affirmative Fair Housing Marketing Plan for Golden Eagle II, contrary to its obligation to affirmatively further fair

---

[4] Oregon Department of Human Services, Office of Forecasting, Research, & Analysis. May 2015 report available at http://www.oregon.gov/dhs/business-services/ofra/Documents/High%20Poverty%20Hotspots%20Tillamook.pdf.
[5] Community Action Partnership of Oregon and Oregon Department of Housing and Community Services joint report. "Moving to Posterity." November 2015. Available at https://www.oregon.gov/ohcs/pdfs/2015-Report-on-Poverty.pdf.

housing, and did not ensure minority households would receive adequate notice of housing opportunities. As a result, the percentage of minority tenants living at Golden Eagle II or minority applicants on the waitlist is substantially less than the minority population within the census tract where the project is located or even than within the county.

44. RD did not assess the impact that the Golden Eagle II prepayment will have on the housing opportunities of minority residents of Tillamook City and County, which contravened its obligation to affirmatively further fair housing.

45. Because RD concluded there would be no disproportional adverse impact on the housing opportunities of minorities, RD preliminarily authorized the prepayment of the Golden Eagle II loan and did not require the owner to offer for 180 days to sell the development to non-profit or public agencies.

46. The Northwest Oregon Housing Authority (NOHA), a non-profit corporation, owns several affordable housing projects in Tillamook City and the county. NOHA also operates a Housing Choice Section 8 Voucher program for residents of the county. The waitlist for vouchers is currently closed and the length of time for an applicant to receive a voucher is approximately one and a half years. NOHA is interested in buying Golden Eagle II at market value and operating it as affordable housing.

**E.     RD's failure to provide notice of due process rights to residents and failure to offer substantially equivalent benefits to residents.**

47. The prepayment has been approved and is currently scheduled to occur on or about November 18, 2016.

48. On September 19, 2016, RD sent a notice to residents advising them of its decision to allow the prepayment request to go forward. That notice failed to provide tenants

with an opportunity to appeal the agency's decision to approve the prepayment request and thereby terminate tenants' rental subsidies.

49. RD has authority to provide residents of prepaid development vouchers to help them remain in their homes or find alternative housing. Rural Development Voucher Program Notice, 81 Fed. Reg. 42309 (June 29, 2016). However, the assistance provided to residents by RD vouchers is substantially inferior to the assistance provided under the Rental Assistance program in that the amount of the voucher subsidy is set permanently as of the date of prepayment and does not alter when rents increase or household income decreases. *Id*. ¶ II e and g. Moreover, RD's authority to issue vouchers is limited by annual appropriations. *Id.*

50. In August of 2016, RD exhausted all voucher funding for Fiscal Year 2016. As of October 1, 2016, RD's authority to issue vouchers is governed by the Continuing Resolution passed by Congress on September 28, 2016. That Continuing Resolution expires on December 9, 2016.

51. On information and belief, RD does not advise residents of developments whose owners are about to prepay their loans of the limitations of the voucher program as compared to the Rental Assistance program, or the exact breadth of the use restrictions that it places on owners who prepay their loans.

52. In several instances, RD regulations and notices suggest that owners that prepay their developments do not have to follow all RD laws and regulations with respect to residents who remain in the development after the prepayment. *See e.g.* 7 C.F.R. § 3560.662(e)(4).

53. There is insufficient alternative comparable subsidized decent, safe and sanitary and affordable housing in Tillamook County to readily house individual Plaintiffs, other current

residents of Golden Eagle II, and CARE clients who would be currently eligible to live at Golden Eagle II.

54.     CARE's client population includes white individuals as well as racial and ethnic minority individuals.  Most low- and very-low-income individuals in Tillamook County are eligible for CARE's services. CARE's services include subsidized rapid re-housing and permanent housing, assistance with re-housing homeless individuals, and limited assistance with rent and utility payments. CARE depends upon Tillamook County's subsidized housing projects as a resource for its clients who need access to safe, decent, sanitary and affordable housing. Removal of a building's subsidized status in Tillamook forces CARE to divert its financial and staff resources in order to provide additional financial assistance to the building's resident households as well as to provide greater levels of assistance to other households who are no longer able to afford rental prices at that building.

55.     Plaintiffs have no adequate remedy at law.

**F.  Plaintiffs attempted to resolve this matter without resort to litigation.**

56.     Plaintiffs attempted to resolve this matter without resort to litigation.

57.     On August 18, 2016, plaintiffs' counsel sent a letter to federal defendants expressing concern with the Golden Eagle II prepayment approval process and requesting that approval of the prepayment be rescinded until all applicable laws had been complied with. Plaintiffs' counsel provided notice of potential litigation and requested a response before September 8, 2016.

58.     On September 16, 2016, plaintiffs' counsel sent a letter to Shively Trust and Vicky Shiveley expressing concern with the prepayment approval process and requesting that request for the prepayment be rescinded until all applicable laws had been complied with.

Plaintiffs' counsel provided notice of potential litigation and requested a response before September 23, 2016.

59.     Defendant Hernandez responded on September 26, 2016, providing sample use restrictions that the defendant owner had agreed to implement and inviting plaintiffs' counsel to provide additional data or information regarding the civil rights impact analysis to RD Oregon staffer Wes Cochran before October 10, 2016.

60.     Plaintiffs' counsel sent federal defendants a second letter on October 6, 2016, again explaining legal concerns with the prepayment approval, and repeated requests that the prepayment be delayed until the agency had modified its regulations and procedures and had properly conducted the prepayment impact analysis.  Plaintiffs' counsel provided notice of potential litigation and requested a response by October 14, 2016.

61.     Plaintiffs' counsel received an "Interim Response" on October 14, 2016 indicating that a full response would be forthcoming on October 28, 2016, and encouraging discussion with Mr. Cochran meanwhile.

62.     Plaintiffs' counsel spoke with Mr. Cochran on October 20, 2016.  Mr. Cochran expressed his inability to discuss or resolve any issues raised in plaintiffs' counsel's letters concerning the prepayment of Golden Eagle II and advised awaiting USDA's response on or by October 28, 2016.

63.     As of November 3, 2016, plaintiffs' counsel have not received a response to their second letter to federal defendants or a response to their letter to Shiveley Trust.

## FIRST CLAIM FOR RELIEF

### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)

**RD Regulations Determining Impact of Prepayment on Minority Housing Opportunities**

**are Inconsistent with the Authorizing Statue.**

64.     Plaintiffs hereby incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

65.     Federal defendants have violated 5 U.S.C. § 706(1) and (2) by:

1) Adopting and following regulations that are inconsistent with the requirement of 42 U.S.C. § 1472(c)(5)(G)(ii), which only allow RD to approve an owner's prepayment request upon a determination that the prepayment would not "materially affect" minority housing opportunities;

2) Allowing the approval of an owner's prepayment request upon a determination that the prepayment would not "disproportionally adversely affect" minorities in the development, on its waiting list, or in the community.  7 C.F.R. 3560.658(b); and

3) Adopting and following regulations that fail to incorporate consideration of the implications of its actions or inactions in permitting this prepayment.  Defendants have violated their duty to administer their programs so as to affirmatively further fair housing pursuant to 42 U.S.C. 3608(d).

66.     These regulations are contrary to law and must be set aside in accordance with 7 U.S.C. § 706.

**SECOND CLAIM FOR RELIEF**

**Administrative Procedure Act, 5 U.S.C. § 706(2)**

**RD's Failure to Establish Standards for Determining Impact of Prepayment on Minority Housing Opportunities Resulted in Arbitrary and Capricious Prepayment Decisions and Violated its Obligation to Affirmatively Further Fair Housing.**

67.     Plaintiffs hereby incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

68.     RD has processed prepayment requests for over 28 years.  During that time, the agency has never adopted complete standards or guidance by which its staff is directed on how to determine whether a prepayment will have an impact on minority housing opportunities when determining whether to approve an owner's request for prepayment.

69.     RD's processing of prepayment requests is a violation of its statutory obligation to affirmatively further fair housing, in light of its failure to establish criteria, standards, guidance and regulations to comply with this obligation.

70.     RD state offices across the country use different and conflicting criteria and standards to determine the impact that a prepayment has on minority households in RD financed developments and on surrounding communities.  RD's failure to adopt uniform standards and guidance has resulted in its staff acting in an arbitrary and capricious manner in violation of 42 U.S.C. § 1472(c)(5)(j), 5 U.S.C. § 706 and 24 U.S.C. 3608(d).

**THIRD CLAIM FOR RELIEF**

**Administrative Procedure Act, 5 U.S.C. § 706(2)**

**RD's Failure to Follow its Limited Guidance for Determining Impact of Prepayment on Minority Housing Opportunities Resulted in Arbitrary and Capricious Prepayment Decisions.**

71.     Plaintiffs hereby incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

72.     RD regulations require its staff to determine the impact of a prepayment on minorities by assessing: "the housing opportunities for minorities" and "if minorities in the project, on the waiting list or in the market area will be disproportionately adversely affected by the loss of the affordable rental units." 7 C.F.R. § 3560. 658(b).

73.     RD Handbook 3-3560 states that the agency must review: the percentage of minorities residing in the project and those residing in the project's market area; the impact on minority residents in the project and in the market area; the vacancy trends and number of potential minority tenants on the waiting list at the project being prepaid and at other projects in the market that might attract minority tenants; and the impact the prepayment will have on the opportunity for minorities residing in substandard housing in the market area to have comparable decent, safe and affordable housing as is offered by the project being prepaid. *Id.* ¶ 15.21.

74.     The RD Oregon staff has failed to comply with RD regulations and handbooks in determining the impact of the Golden Eagle II prepayment on minorities. They completely failed to assess the impact of the prepayment on minority residents in the market area. They also did not assess the number of minority tenants on the waiting lists at other projects in the market that might attract minority tenants. Lastly, they failed to assess the impact the prepayment will have on the opportunity for minorities residing in substandard housing in the market area to have comparable decent, safe and affordable housing as offered by the project being prepaid.

75.     In failing to do even the limited required analysis in RD guidance, Defendants have acted arbitrarily and capriciously, entitling plaintiffs to relief under 5 U.S.C. §706.

## FOURTH CLAIM FOR RELIEF

**Fourteenth Amendment to the U.S. Constitution (Substantive Due Process),**

**Administrative Procedure Act, and Declaratory Relief, 5 U.S.C. § 706(2)**

**RD Failed to Advise Residents of their Right to Appeal RD Decisions.**

76.     Plaintiffs hereby incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

77.     USDA regulations, promulgated under authority set out at 42 U.S.C. § 1480(g), *inter alia*, grant participants, who receive payment or other benefit in accordance with all RD and RHS department programs, the right to appeal any agency decision by which they are affected to a hearing officer of the Department's National Appeals Division (NAD).  7 C.F.R. §§ 11.1, 11.2 and 11.3.

78.     When an owner of a Section 515 development prepays a loan, these benefits terminate as does RD's regular supervision and monitoring of most of the owner's actions, including compliance with the owner's obligation to affirmatively further fair housing, approval of all rent increases, the maintenance of the development, the content of leases, the term of leases, and the basis upon which a lease may be terminated.

79.     42 U.S.C. § 1480(g) requires RD to give to tenants written notice of the reasons for the denial, reduction or termination of assistance and of the right to appeal the adverse decision.

80.     None of the individual plaintiffs have received notice from RD stating the specific reasons why the agency has approved the owner's request to prepay the loan or advising the residents of their right to appeal the decision to the National Appeals Division.

81.     Federal defendants' failure to advise the residents of the reasons RD approved the prepayment and of their right to appeal that decision to a NAD hearing officer violates plaintiffs'

statutory and constitutional due process rights, is therefore contrary to law, and must be set aside in accordance with 5 U.S.C. § 706.

## FIFTH CLAIM FOR RELIEF

### Administrative Procedure Act, 5 U.S.C. § 706(2)

### RD's Administration of the Rural Voucher Program is Arbitrary and Capricious.

82.     Plaintiffs hereby incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

83.     ELIHPA was enacted by Congress in 1988 to limit the prepayment of Section 515 loans and the displacements of occupants financed under the program. Pub. L. No. 100-242, § 202 (b), 101 Stat. 1877, 1878 (1988).

84.     In 2006, Congress, through the appropriations act, made available funding for the operation of an RD voucher program, authorized by 42 U.S.C. § 1490r, but put severe restrictions on its operation.  Funding for RD vouchers has continued, subject to the same restrictions, every year since 2006 through the annual appropriations process. *See* Pub. L. No. 114-113, § 2, Div. A, Title III, 129 Stat. 2242, 2260 (Dec. 18, 2015) (Consolidated Appropriations Act, 2016).

85.     On information and belief, RD has offered and issued vouchers to residents of Section 515 housing without regard as to whether the household is moving from or staying in the development, or whether the prepayment was or will be subject to use restrictions. On information and belief, RD has issued most of its vouchers to residents who stayed in their homes after prepayment even though the owners were subject to use restrictions.  This caused RD to run out of voucher funding in August 2016 and RD is likely to continue prematurely

running out of voucher funding in the next several fiscal years unless Congress increases funding for the program.

86.     RD actions encourage Section 515 owners to prepay their loans because they are assured of getting market rate voucher funding through the period that the existing tenants remain in the development. This practice encourages owners to prepay their loans and convert developments to market rate housing.  This is contrary to the purposes of ELIHPA and has caused RD to issue and renew more vouchers than are actually needed, thereby also undermining individuals' capacity to continue to receive vouchers assistance in the future as well as the opportunity to move to other housing.  RD's practices are arbitrary and capricious and in violation of Section 706 of the Administrative Procedure Act.

87.     RD does not allow residents of Section 515 developments to apply for RD vouchers until the prepayment has occurred.  Moreover, RD's voucher notice only requires it to advise residents of their eligibility for vouchers within 90 days following the prepayment.  61 Fed. Reg. 42309, 42311 (June 29, 2016) (¶ II 3). On information and belief, this practice makes it difficult for residents to apply for and receive vouchers within 60 days of the prepayment and decreases their capacity to move to other housing if they choose to move after the prepayment. This forces residents to pay prevailing market rent for housing for some period. None of the plaintiffs have the financial capacity to pay market rent.

88.     RD's practice of only allowing residents to apply for vouchers after the loan prepayment and to only allow vouchers to pay rent retroactively for 60 days after issuance is arbitrary and capricious and subject to relief under 5 U.S.C. § 706.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

1. A declaration that federal defendants' acts and omissions violate and continue to violate the Fourteenth Amendment to the U.S. Constitution, the Administrative Procedure Act, and USDA statutes, regulations and handbooks;

2. A declaration that federal defendants have an obligation when intending to allow prepayments subject to use restrictions to notify residents of the precise obligations of the owner to continue to operate the development as if it were financed under the Section 515 program.

3. An injunction enforcing those declarations and requiring federal defendants to:

   a. disallow prepayment of Golden Eagle II by individual defendants except in full compliance with 42 U.S.C. § 1472(c) and 24 U.S.C. 3608(d);

   b. publish and adopt regulations precluding prepayment of a Section 515 loan without full consideration of whether the prepayment will materially affect minority housing opportunities, and to include specific standards therein establishing criteria by which RD staff is to determine whether prepayments will materially affect minority housing opportunities.

   c. publish and adopt regulations that conform the operation, management and methods of administration of its prepayment program to its obligation to affirmatively further fair housing pursuant to 24 U.S.C. 3608(d)

   d. modify its regulations so as to inform all residents, in a development whose owner has applied for a prepayment, that they have a right to notice of the RD decision to approve or disapprove the owner's prepayment request, advise them of the reasons for the decision, advise them that they have a right to appeal the decisions approving a prepayment under USDA regulations set out

at 7 C.F.R. Part 11 and, in the event that an owner appeals a decision denying the right to prepay the loan, that the residents have a right to participate in the owner's appeal of that decision;

e. refrain from issuing vouchers to residents of Section 515 developments that are being prepaid subject to use restrictions unless the residents plan to move to other private housing and allows residents to apply for vouchers before the prepayment of the loan; and

f. issue only use restrictions that require the owner and any successor in interest to operate the Section 515 development for the benefit of residents in the development at the time of prepayment as if the development was financed by a Section 515 loan and subject to all the regulations set out in 7 C.F.R. §§ 3560.1, et seq.;

4. An award of Plaintiffs' costs and reasonable attorney fees; and

5. Such other and further legal and equitable relief as this Court deems just and proper.


DATED this 4th day of November, 2016.

OREGON LAW CENTER

/s/ Juhi S. Aggarwal
_____
Juhi S. Aggarwal, OSB No. 130764
jaggarwal@oregonlawcenter.org
Ellen Johnson, OSB No. 802785
eljohnson@oregonlawcenter.org
Michael Pijanowski, OSB No. 004426
mpijanowski@oregonlawcenter.org
Edward Johnson, OSB No. 965737
ejohnson@oregonlawcenter.org
230 NE 2nd Ave., Suite F
Hillsboro, OR 97124

(503) 640-4115

Of Attorneys for Plaintiffs

NATIONAL HOUSING LAW PROJECT

Gideon Anders, CA Bar No. 86872*
ganders@nhlp.org
Jessica Cassella, CA Bar No. 306875*
jcasella@nhlp.org
703 Market St.,
San Francisco, CA 94103
(415) 546-7000

Of Counsel
*Application for Admission *pro hac vice*
Forthcoming