Juhi S. Aggarwal, OSB No. 130764
jaggarwal@oregonlawcenter.org
Ellen Johnson, OSB No. 802785
eljohnson@oregonlawcenter.org
Michael Pijanowski, OSB No. 004426
mpijanowski@oregonlawcenter.org
Edward Johnson, OSB No. 965737
ejohnson@oregonlawcenter.org
OREGON LAW CENTER
230 NE 2nd Ave., Suite F
Hillsboro, OR 97124
(503) 640-4115

Of Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| LISA MCFALLS, MICHAEL MCFALLS, FRED WOODRING, and COMMUNITY ACTION RESOURCE ENTERPRISES, INC., an Oregon not-for-profit organization,<br><br>                    Plaintiffs,<br><br>v.<br><br>SONNY PURDUE, Secretary of the Department of Agriculture; ROGER GLENDENNING, Acting Undersecretary for Rural Development; RICH DAVIS, Acting Administrator Rural Housing Service; JILL REESE, Acting Oregon Rural Development State Director;<br><br>                    Defendants. | Case No. 3:16-cv-02116-SI<br><br>SECOND AMENDED COMPLAINT<br>5 USC §706(1) and (2) |

## PRELIMINARY STATEMENT

1.      Individual Plaintiffs are very low-income renters who live in Golden Eagle II (GE II), a federally financed and subsidized apartment building in Tillamook, Oregon. GE II is a 32-unit Section 515 rental project that is financed and deeply subsidized by Rural Development (RD).[1] The Shiveley Trust, owner of GE II, has applied to RD for permission to prepay the loan that financed GE II. As allowed by the Emergency Low Income Housing Preservation Act of 1987 (ELIHPA), RD has recently denied the GE II owner's request to prepay the loan and, instead, has required that the development be offered for sale to a nonprofit or public agency in order to maintain it as affordable housing. ELIHPA provides that if no offer is made to purchase GE II or if no financing is available to enable a nonprofit or public entity to purchase GE II, the owner is free to prepay GE II's loan without any restrictions. 42 U.S.C. § 1472(c)(5)(A)(ii). In that case, the individual plaintiffs become eligible for RD vouchers that will subsidize their rent and enable them to continue to live in their GE II homes or move to other decent, safe, and sanitary housing. The Federal Defendants, however, are operating the RD voucher program in a manner that is contrary to law and is likely to lead to Plaintiffs being unable to secure RD vouchers. Moreover, even if they qualify for vouchers, RD is operating the voucher program is manner that makes it likely to lead to a gap between the time that the loan is prepaid and the Individual Plaintiffs secure vouchers, exposing Plaintiffs to increased rents for an interim period. In short, RD's operation of the voucher program will lead to the individual plaintiffs having to pay increased rents that they cannot afford and becoming displaced or even homeless.

---

[1] The Rural Housing Service (RHS) is the agency within the U.S. Department of Agriculture (USDA) that is vested with responsibility for administering the rural housing programs authorized by Title V of the Housing Act of 1949. (codified at 42 U.S.C. § 1471 *et. seq.*). Notwithstanding, all the rural housing programs, including the Section 515 rental housing program, are administered in all the states by Rural Development (RD), a USDA mission area. References throughout this complaint are made to RD instead of RHS or USDA to avoid confusion.

2. Tillamook County Community Action Resource Enterprises, Inc. (CARE) relies upon subsidized and affordable housing projects in Tillamook County as a resource for its low-income clients who need access to safe, decent, sanitary and affordable housing. Affordable housing, let alone subsidized rental housing, is very scarce in Tillamook County. The potential loss of GE II and any other RD-subsidized housing in Tillamook County will exacerbate the unavailability of affordable housing for low-income Oregonians and particularly for CARE's clients.

3. On or before September 19, 2016, RD approved the Shiveley Trust's request to prepay the GE II loan. The process that RD used to approve the prepayment did not conform to ELIHPA and was otherwise arbitrary and capricious. In response to Plaintiffs' filing a complaint and a motion for preliminary injunction challenging the prepayment decision, RD withdrew and reconsidered its approval of the owner's prepayment request. As a result of the reconsideration in early 2017, RD is requiring the owner to offer GE II for sale to a nonprofit or public agency. The process by which RD reached this decision still does not conform to ELIHPA and is arbitrary and capricious. Moreover, despite CARE's and Individual Plaintiffs' earlier claims, RD has not modified its regulations to ensure that its processing of future prepayment requests would be consistent with ELIHPA. RD's failures continue to harm CARE and its clients because the agency has not made any effort to ensure that future prepayment decisions in Tillamook County are made consistently with ELIHPA and are otherwise not arbitrary and capricious.

\\
\\
\\
\\

Page 3 – SECOND AMENDED COMPLAINT

## JURISDICTION AND VENUE

4. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, 1343(a) (3) and (4), and 1361, in that plaintiffs' claims arise under the Administrative Procedure Act. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

5. Venue is proper pursuant to 28 U.S.C. § 1391 because at least one defendant is a resident of this District and a substantial part of the events, acts or omissions giving rise to plaintiffs' claims occurred here.

## PARTIES

6. Plaintiffs Michael and Lisa McFall are very low-income married residents of Golden Eagle II who pay $220 per month for a two-bedroom apartment under the terms of a written rental agreement which began in March 2015 and has been renewed annually since. Prior to March 2015, they had lived in a studio apartment owned by the Shiveley Trust for approximately one year before being briefly homeless. They receive Rental Assistance. Mr. and Mrs. McFall are aged 41 and 37 respectively, and both have disabilities. Their sole source of income is Mr. McFall's Social Security Disability Income of $733 per month.

7. Plaintiff Fred Woodring is a very low-income resident of Golden Eagle II who pays $220 per month for a studio apartment under the terms of a written rental agreement that began in March 2013 and has been renewed annually since. He receives Rental Assistance. When he initially moved in, Mr. Woodring did not receive Rental Assistance. He paid $530 per month in rent; approximately 43% of his income. He was on the waitlist for Rental Assistance for twenty months before he was approved. His sole source of income is Social Security Supplemental Security Income of $733 per month.

\\

8. Plaintiff CARE is a non-profit service agency based in Tillamook, Oregon; its mission is to ease the effects of poverty in the county by providing housing, emergency, and limited financial assistance services to low-income households in the county. CARE's client population includes racial and ethnic minorities. CARE relies upon local subsidized housing projects, including GE II, as a resource for its clients who need access to safe, decent, sanitary and affordable housing. Loss of a building's subsidy diverts CARE's limited financial and staff resources to provide additional assistance to that building's resident households and to attempt to place other households in more expensive market rate housing. RD's approval of any RD prepayment request in Tillamook County will frustrate CARE's mission and affect its financial resources.

9. Defendant Sonny Purdue, the Secretary of the United States Department of Agriculture (USDA), is statutorily vested with the authority to operate the rural housing programs authorized by Title V of the Housing Act of 1949, 42 U.S.C. §§ 1471 et. seq. Defendant Purdue is sued in his official capacity.

10. Defendant Roger Glendenning is the Acting Undersecretary for Rural Development. The rural housing programs are administered and overseen by the RD mission area of USDA. Defendant Glendenning is sued in his official capacity.

11. Defendant Rich Davis is the Acting Administrator of the Rural Housing Service (RHS), and is responsible for the day-to-day administration of USDA's rural housing programs at the national level. Mr. Davis also has the title of RD Acting Administrator of Housing and Community Facilities Programs. Defendant Davis is sued in his official capacity.

12. Defendant Jill Reese is the Acting RD State Director for Oregon. She is responsible for the day-to-day administration of the RD housing programs in Oregon. On

information and belief, Ms. Reese, or a RD employee under her direction and control, oversees the operation of GE II and is responsible for processing prepayment requests submitted from Oregon owners of RD-financed rental housing. Defendant Reese is sued in her official capacity.

**FACTS**

**A.     Golden Eagle II loan and subsidy history.**

13.    GE II is a 32-unit development located in the City of Tillamook, Tillamook County, Oregon, that is financed by USDA under Section 515 of the Housing Act of 1949. 42 USC § 1485. Occupancy is limited to persons of low and moderate income. 7 C.F.R. § 3560.152.

14.    GE II has twelve studio apartments, twelve one-bedroom apartments and eight two-bedroom apartments. One of these units is occupied by an on-site manager.

15.    Twelve units at GE II are rented to tenants at reduced rents under the RHS Interest Credit program authorized by 42 U.S.C. § 1490a(a)(1) (B). Minimum rent for these units, called the 'basic rent,' are set by unit size by adding the cost of operating the development and amortizing the RD loan at 1% interest. Residents in these units pay the higher of the basic rent or 30% of their income. Monthly rents for these units at GE II range from $530 to $730.

16.    Nineteen of the thirty-one rental units at GE II are deeply subsidized under the RD Rental Assistance program authorized by Section 521 of the Housing Act of 1949, allowing the tenants of to pay 30% of their income for shelter, which includes rent and utilities. 42 U.S.C. § 1490a(2)(A); *see* 7 C.F.R. § 3560.11. Individual plaintiffs each receive Rental Assistance and their monthly rent is $220.

17.    The USDA loan for GE II was entered on February 27, 1976, for a term of 50 years, with the final loan payment scheduled for February 27, 2026. The original borrowers were

George Gaylord Shiveley and Millie Shiveley. On information and belief, ownership has subsequently been transferred to theShiveley Trust, of which Vicky Shiveley is the sole trustee.

### B. Other RD Section 515 Developments in Tillamook County

18. There are five RD Section 515 rental housing developments in Tillamook County. Echanie Court is a 12 unit family development with all units subsidized with Rental Assistance. Evergreen Gardens is a 34 unit elderly development with 19 of the units subsidized with Rental Assistance. Meadow Glen Apartments is a 32 unit family development with 20 of the units subsidized with Rental Assistance. Pine Avenue Apartments is a 30 unit family development with all the units subsidized with Rental Assistance. Sheridan Square Apartments is a 17 unit elderly development with 16 of the units subsidized with Rental Assistance. The loans for at least three of these developments are currently eligible for prepayment.

### C. Prior Proceedings in this Action

19. On November 4, 2016, the individual and organizational plaintiffs commenced this litigation which challenged RD's (i) decision to approve the prepayment of GE II loan on the ground that the RD regulations and prepayment decision did not conform to ELIHPA and were made in an arbitrary and capricious manner; (ii) denial of the Individual Plaintiffs' regulatory, statutory and Constitutional due process rights to appeal the prepayment approval; and, (iii) administration of the voucher program on the ground that it operated in a manner that undercut ELIHPA and is otherwise arbitrary and capricious. The Plaintiffs sought declaratory and injunctive relief against the federal defendants to correct the manner by which RD was administering the ELIHPA prepayment process and the RD Voucher program. ECF 1.

20. Plaintiffs amended their complaint and moved for a preliminary injunction. ECF 12 and 13. At the Court's scheduled hearing on Plaintiffs' motion for preliminary injunction,

Federal Defendants advised the Court that there were irregularities in its decision to approve the GE II prepayment, they were withdrawing that decision, and that they planned to issue a new decision within three months. *See* ECF 30. Federal Defendants then answered the first amended complaint. ECF 31.

21. On or about April 24, 2017, FederalDefendants released a new decision on the Shiveley Trust's request to prepay the GE loan. ECF 38-1. In that decision, Federal Defendants concluded that the prepayment of the GE II loan would disproportionally and materially adversely impact minority housing opportunities. Accordingly, the Federal Defendants concluded that the Shiveley Trust must offer to sell GE II to a nonprofit or public agency for a period of 180 days.

22. On or about May 11, 2017, the Shiveley Trust advised RD that it would comply with RD's decision and would offer the development for sale after an appraisal of the property is completed.

23. Neither RD's latest decision, nor any other RD communication with the Court or Plaintiffs' Counsel, addresses all the relief that Plaintiffs have been seeking. Namely, RD has not amended its prepayment regulations to conform to ELIHPA. It has not established standards and guidelines to determine whether a prepayment will have a material effect on minority housing opportunities, and it has not taken any steps to eliminate the arbitrary and capricious manner in which prepayment decisions are made.

24. The new RD decision has not resulted in a revision of the RD regulations that permit its lifting of use restrictions when financial assistance to residents is terminated for reasons beyond the 515 owner's control. Nor has the new decision addressed how RD is managing the Voucher Program in a manner that violates ELIHPA, unnecessarily causes

exhaustion of program funding, and unnecessarily exposes residents to increased rents, displacement and homelessness.

### D. Statutory History of USDA Loan Prepayment Legislation

25. Any mortgage payment that retires a USDA mortgage prior to its original maturity date is a "prepayment." 7 C.F.R. §3560.11. It is subject to the prepayment restrictions of 42 U.S.C. § 1472(c) and RD regulations codified at 7 C.F.R. Part 3560, Subpart N.

26. Prior to 1987, there were no restrictions limiting the rights of Section 515 project owners to prepay their mortgages and leave the program. Responding to increased prepayments of Section 515 loans in the early to middle 1980s and the negative impact of those prepayments had on residents – severely increased rents and displacement due to loss of rental subsidies – Congress enacted detailed legislation to preserve Section 515 projects as affordable housing by restricting the loan prepayment rights of owners who had entered Section 515 loans before December 21, 1979. Emergency Low Income Housing Preservation Act of 1987, P.L. 100-242 (Feb. 5, 1988) (ELIHPA). The rural provisions of this act, as amended in 1992, are now codified at 42 U.S.C. § 1472(c).

### E. Statutory and regulatory procedure for a pre-1979 prepayment request.

27. Within 30 days of receiving a complete prepayment request, RD must notify the residents of the development about the owner's request to prepay the loan. 7 C.F.R. § 3560.654.

28. Once a complete prepayment request has been submitted, RD has 60 days to determine the eligibility of the loan for prepayment and whether the borrower has or will comply with applicable prepayment laws and regulations. If the owner's prepayment request meets these and other requirements, RD must offer incentives to the owner to remain in the program. 42 U.S.C. § 1472(c)(3) and 7 C.F.R. § 3560.653(e).

29. If the owner rejects the incentives, RD must determine whether the prepayment will materially affect housing opportunities of minorities in the project, on the waiting list or in the market area. 42 U.S.C. § 1472(c)(5)(G)(ii); 7 C.F.R. 3560.658(b). In doing so, RD is required, at a minimum:

> 1) to consider the percentage of minorities residing in the project and the percentage of minorities residing in the projects in the market area where displaced tenants are most likely to move;
>
> 2) to consider the impact of prepayment on minority residents in the project and in the market area;
>
> 3) to determine whether displaced minority tenants will be forced to move to other low-income housing in areas not convenient to their places of employment, to areas with a concentrated minority population and/or to areas with a concentration of substandard housing;
>
> 4) to determine the vacancy trends and number of potential minority tenants on the waiting list at the project being prepaid and at other projects in the market area that night attract minority tenants; and
>
> 5) to determine the impact prepayment will have on the opportunity for minorities residing in substandard housing in the market area to have comparable decent, safe and affordable housing, as is offered by the project being prepaid.

RD Handbook 3-3560, Chapter 15, ¶15.22.

30. If RD determines that a prepayment will materially affect minority housing opportunities, the owner must offer, for 180 days, to sell the development at its market value to a

nonprofit or public agency which would maintain the development's affordability. 42 U.S.C. §§ 1472(c)(5)(A) and 1472(c)(5)(G).

31. If there is no material effect on minority housing opportunities, RD must then determine if there is adequate comparable alternative housing in the community to which the current residents of the development can relocate. If adequate comparable affordable housing is available, the owner is free to prepay the loan. If RD determines that there is not adequate comparable alternative housing, the owner can only prepay the loan subject to use restrictions that protect the current residents as long as they choose to live in the development. 42 U.S.C. § 1472(c)(5)(A) and 7 C.F.R. § 3560.658(b)(3).

32. 42 U.S.C. § 1471(g) obligates RD to administer its programs, such as the Section 515 program, "consistent with program goals and objectives, so that the involuntary displacement of families and businesses is avoided."

33. Under RD authorizing statutes and regulations, once a loan is prepaid all subsidies that reduce the rents to residents, including Interest Credit and Rental Assistance, cease. 42 U.S.C. §§ 1490a(a)(1)(B) and 1490a(2)(A); *see* 7 C.F.R. § 3560.11.

**F. RD's Prepayment Impact Analysis.**

34. Defendants Shiveley Trust and Vicky Shiveley submitted an application to RD on or about May 27, 2015, to prepay the loan before its maturity date.

35. RD first concluded that the GE II loan could be prepaid subject to use restrictions.

36. Upon reconsideration, the agency concluded that the loan cannot be prepaid and that the Shiveley Trust must offer to sell GE II to a nonprofit or public agency. In its revised impact analysis, RD concluded that the Prepayment of GE II will "impose disparate and adverse impact (effect) on minorities." ECF 38-1, at 22.

### G. The RD Voucher Program

37. RD has authority to provide residents of prepaid development vouchers to help them remain in their homes or find alternative housing. Rural Development Voucher Program Notice, 82 Fed. Reg. 21972 (May 11, 2017). However, the assistance provided to residents by RD vouchers is substantially inferior to the assistance provided under the Rental Assistance program in that the amount of the voucher subsidy is set permanently as of the date of prepayment and does not change when rents increase or household income decreases. *Id*. ¶ II e and g.

38. RD's authority to issue vouchers is limited by annual appropriations. *Id.* In Fiscal Year 2015, RD received $7 million in appropriations for the RD Voucher program. It actually expended $15.6 million. In Fiscal Year 2016, RD was appropriated $15 million for the voucher program. It actually expended $19.4 million. On May 5, 2017, Congress appropriated $19.4 million for the program for Fiscal 2017. Between October 1, 2016 and May 4, 2017, RD was operating under a Continuing Resolution that allowed it to expend funding for the program based on a prorated a share of the previous year's (Fiscal Year 2016) approved appropriations.

39. In August of 2016, RD exhausted all voucher funding for Fiscal Year 2016. On information and belief, RD was not able to meet the full demand for new and renewal vouchers in August and September of 2016.

40. In April of 2017, RD exhausted all voucher funding available to it under the Fiscal Year 2017 Continuing Resolution then in effect. On information and belief, RD was not able to issue new or renew existing voucher to meet the full demand for new or renewed vouchers during the months of April and May of 2017.

41. CARE's client population includes white individuals as well as racial and ethnic minority individuals. Most low- and very-low-income individuals in Tillamook County are eligible for CARE's services. CARE's services include subsidized rapid re-housing and permanent housing, assistance with re-housing homeless individuals, and limited assistance with rent and utility payments. CARE depends upon Tillamook County's subsidized housing projects as a resource for its clients who need access to safe, decent, sanitary and affordable housing. Removal of a building's subsidized status in Tillamook forces CARE to divert its financial and staff resources in order to provide additional financial assistance to the building's resident households as well as to provide greater levels of assistance to other households who are no longer able to afford rental prices at that building.

42. Plaintiffs have no adequate remedy at law.

**H. Plaintiffs attempted to resolve this matter without resort to litigation.**

43. Plaintiffs have made several attempts to resolve this matter without resort to litigation. Those attempts were made before this action was filed and have been renewed several times since. Most recently, Plaintiffs' and Defendants' counsel have conferred with respect to the Plaintiffs' remaining claims after Defendants' issuance of the revised prepayment decision. As evidenced by the Joint Status Report filed with the Court on June 7, 2017, Plaintiffs' and Defendants' counsel have not been able to agree about the status of the case let alone any manner in which the remaining claims may be resolved.

\\
\\
\\
\\

## FIRST CLAIM FOR RELIEF

## Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)

## RD Regulations for Determining Impact of Prepayment on Minority Housing Opportunities are Inconsistent with the Authorizing Statue.

44. Plaintiffs hereby incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

45. Federal defendants have violated 5 U.S.C. § 706(1) and (2) by:

   1) Adopting and following regulations that are inconsistent with the requirement of 42 U.S.C. § 1472(c)(5)(G)(ii), which only allow RD to approve an owner's prepayment request upon a determination that the prepayment would not "materially affect" minority housing opportunities;

   2) Approving owners' prepayment requests upon a determination that the prepayment would not "disproportionally adversely affect" minorities in the development, on its waiting list, or in the community. 7 C.F.R. 3560.658(b); and

   3) The regulations are contrary to law and must be set aside in accordance with 7 U.S.C. § 706.

## SECOND CLAIM FOR RELIEF

## Administrative Procedure Act, 5 U.S.C. § 706(2)

## RD's Failure to Establish Standards for Determining Impact of Prepayment on Minority Housing Opportunities Results in Arbitrary and Capricious Prepayment Decisions.

46. Plaintiffs hereby incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

47. RD has processed prepayment requests for over 28 years. During that time, the agency has never adopted standards or guidance by which its staff is advised or directed on how to determine whether a prepayment will have an effect on minority housing opportunities when determining whether to approve an owner's request for prepayment. As a result, RD staff determinations with respect to whether a prepayment has material impact on minority housing opportunities varies greatly with respect to the data that is considered and the manner in which conclusions are reached.

48. RD state offices across the country use different and conflicting criteria and standards to determine the impact that a prepayment has on minority households in RD financed developments and on surrounding communities. RD's failure to adopt uniform standards and guidance has resulted in its staff acting in an arbitrary and capricious manner in violation of 42 U.S.C. § 1472(c)(5)(j), 5 U.S.C. § 706 and 24 U.S.C. § 3608(d).

## THIRD CLAIM FOR RELIEF

### Administrative Procedure Act, 5 U.S.C. § 706(2)

**RD's Administration of the Rural Voucher Program is Arbitrary and Capricious.**

49. Plaintiffs hereby incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

50. ELIHPA was enacted by Congress in 1988 to limit the prepayment of Section 515 loans and the displacements of occupants financed under the program. Pub. L. No. 100-242, § 202 (b), 101 Stat. 1877, 1878 (1988).

51. In 2006, Congress, through the appropriations act, made available funding for the operation of an RD voucher program, authorized by 42 U.S.C. § 1490r, but put severe restrictions on its operation. Funding for RD vouchers has continued, subject to the same

primary restrictions, every year since 2006 through the annual appropriations process. *See* Pub. L. No. 115-31, ___ Stat. ___, ____ (May 5, 2017) (Consolidated Appropriations Act, 2017).

52. RD has offered and issued vouchers to residents of Section 515 housing without regard as to whether a household is moving from or staying in the development, or whether the prepayment was, or will be, subject to use restrictions.

53. On information and belief, RD has issued most of its vouchers to residents who stayed in their homes after prepayment even though the owners were subject to use restrictions. This caused RD to run out of voucher funding in August 2016 and in 2017. RD is likely to run out of voucher funding prior to the end of the next several fiscal years unless Congress increases funding for the program substantially.

54. RD's actions encourage Section 515 owners to prepay their loans because the owners are assured of getting market rate voucher funding through the period that the existing tenants remain in the development. This practice encourages owners to prepay their loans and convert developments to market rate housing. This is contrary to the purposes of ELIHPA and has caused RD to issue and renew more vouchers than are actually needed, thereby also undermining individual voucher holders' capacity to continue to receive vouchers assistance in the future as well as the opportunity to move to other housing. RD's practices are arbitrary and capricious and in violation of Section 706 of the Administrative Procedure Act.

55. RD does not allow residents of Section 515 developments to apply for RD vouchers until the prepayment has occurred. Moreover, RD's voucher notice only requires it to advise residents of their eligibility for vouchers within 90 days following the prepayment. 82 Fed. Reg. 21972 (May 11, 2017) (¶ II 3). On information and belief, this practice makes it difficult for residents to apply for and receive vouchers within 60 days of the prepayment and

decreases their capacity to move to other housing if they choose to move after the prepayment. This forces residents to pay prevailing market rent for housing for some indefinite period of time. None of the individual plaintiffs have the financial capacity to pay market rent.

56. RD's practice of only allowing residents to apply for vouchers after the loan prepayment and to only allow vouchers to pay rent retroactively for 60 days after issuance is arbitrary and capricious and subject to relief under 5 U.S.C. § 706.

## FOURTH CLAIM FOR RELIEF

### Administrative Procedure Act, 5 U.S.C. § 706(2)

**RD's Regulations Authorizing the Termination of Use Restrictions Violates ELIPHA**

57. Plaintiffs hereby incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

58. RD's regulations authorize the agency to terminate use restrictions imposed on owners who prepay their Section 515 loans when financial assistance provided to the residents of the housing will no longer be provided due to no fault, action, or lack of action on the part of the borrower. 7 C.F.R. § 3650.662(f).

59. This regulation is contrary to ELIPHA and must be set aside in accordance with 7 U.S.C. § 706.

\\
\\
\\
\\
\\
\\

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

1. A declaration that RD regulations requiring its staff to determine whether a prepayment will have a disproportional impact on minority housing opportunities is inconsistent with ELIHPA.

2. A declaration that RD policy of issuing vouchers to all residents of prepaid developments regardless of whether the prepayment is subject to use restrictions is contrary to ELIHPA and the purposes of the RD voucher program.

3. A declaration that regulations authorizing federal defendants to release owners from their obligation to comply with previously imposed use restrictions when financial assistance to residents is terminated for reasons outside the owner's control are contrary to law;

4. A declaration that RD policies for precluding the submission of voucher applications until after a prepayment has been completed and giving RD up to 90 days to issue vouchers is arbitrary and capricious.

5. An injunction prohibiting the federal defendants from:

    a. Approving prepayment requests under its current regulations until RD has published and adopted revised regulations that conform to the ELIHPA standard of determining whether a prepayment will materially affect minority housing opportunities and establish standards as to how those determinations are to be made.

  b. issuing vouchers to residents of Section 515 developments that are being prepaid subject to use restrictions unless the residents plan to move to other private housing.

6. An award of Plaintiffs' costs and reasonable attorney fees; and

7. Such other and further legal and equitable relief as this Court deems just and proper.

DATED this14th day of July, 2017.

                OREGON LAW CENTER

                /s/ Juhi S. Aggarwal

                Juhi S. Aggarwal, OSB No. 130764
                jaggarwal@oregonlawcenter.org
                Ellen Johnson, OSB No. 802785
                eljohnson@oregonlawcenter.org
                Michael Pijanowski, OSB No. 004426
                mpijanowski@oregonlawcenter.org
                Edward Johnson, OSB No. 965737
                ejohnson@oregonlawcenter.org
                230 NE 2nd Ave., Suite F
                Hillsboro, OR 97124
                (503) 640-4115

                Of Attorneys for Plaintiffs

                NATIONAL HOUSING LAW PROJECT

                Gideon Anders, CA Bar No. 86872*
                ganders@nhlp.org
                Jessica Cassella, CA Bar No. 306875*
                jcasella@nhlp.org
                703 Market St.,
                San Francisco, CA 94103
                (415) 546-7000

                Of Counsel

                *Admitted Pro Hac Vice*