# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **LISA McFALLS, MICHAEL McFALLS, FRED WOODRING, and COMMUNITY ACTION RESOURCE ENTERPRISES, INC.,**<br><br>    Plaintiffs,<br><br>  v.<br><br>**SONNY PURDUE, Secretary of the Department of Agriculture; ROGER GLENDENNING, Undersecretary for Rural Development; RICH DAVIS, Administrator Rural Housing Service; and JOHN E. HUFFMAN, Oregon Rural Development State Director**,<br><br>    Defendants. | Case No. 3:16-cv-2116-SI<br><br>**OPINION AND ORDER** |

Juhi S. Aggarwal, Ellen Johnson, Michael Pijanowski, and Edward Johnson, OREGON LAW CENTER, 230 NE Second Avenue, Suite F, Hillsboro, OR 97124; Gideon A. Anders and Jessica L. Cassella, NATIONAL HOUSING LAW PROJECT, 703 Market Street, Suite 2000, San Francisco, CA 94103. Of Attorneys for Plaintiffs.

Billy J. Williams, Unites States Attorney, James E. Cox, Jr., Assistant United States Attorney, and Sean E. Martin, Assistant United States Attorney, UNITED STATES ATTORNEY'S OFFICE, DISTRICT OF OREGON, 1000 SW Third Avenue, Suite 600, Portland, OR 97204. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

Plaintiffs Lisa McFalls, Michael McFalls, and Fred Woodring (the "Individual Plaintiffs") are low-income renters who live in federal subsidized housing at the Golden Eagle II ("GE") apartment building in Tillamook, Oregon. Plaintiff Community Action Resource Enterprises, Inc. ("CARE") is a nonprofit organization based in Tillamook County, Oregon. CARE assists low-income persons in obtaining affordable housing in Tillamook County, including at GE.

GE is an affordable housing unit for low-income persons. GE was financed with a direct government loan and also receives operating subsidies from the United States Department of Agriculture ("USDA") Rural Housing Service and Rural Development ("RD") agencies. Plaintiffs sue Defendants Sonny Purdue, Secretary of the USDA; Roger Glendenning, Undersecretary for RD; Rich Davis, Administrator of the USDA's Rural Housing Service; and John E. Huffman, Oregon State Director of RD, all in their official capacities.

In their original complaint, Plaintiffs challenged RD's initial Civil Rights Impact Analysis ("CRIA I"), which concluded that prepayment of GE's loan would not materially affect minority housing opportunities and approved the request by GE's owner's to prepay the loan. This prepayment would have reduced the protections provided to GE's tenants under RD's program and might have resulted in the displacement of the Individual Plaintiffs. After Plaintiffs filed their original complaint and moved for a preliminary injunction to enjoin the approval of the requested loan prepayment, Defendants rescinded their approval. RD then issued a second Civil Rights Impact Analysis ("CRIA II"), which found that prepayment would materially affect minority housing opportunities. Based on that finding, RD required that GE be offered for sale to a nonprofit or public agency for 180 days in order to try to maintain GE as affordable housing.

Defendants state that the mandatory 180-day waiting period began on October 17, 2017, and will conclude on April 15, 2018.

After RD issued CRIA II, Plaintiffs filed a Second Amended Complaint. Plaintiffs allege: (1) Defendants violated the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, by implementing regulations inconsistent with the governing statute with respect to analyzing the effect of prepayment on minority housing; (2) RD violated the APA by failing to establish standards or guidance for determining the effect of prepayment on minority housing opportunities; (3) RD violated the APA by administering the Rural Voucher Program in an arbitrary and capricious manner; and (4) RD's regulations authorizing the termination of use restrictions violates the Emergency Low Income Housing Preservation Act ("ELIHPA"), 42 U.S.C. § 1472. Defendants move to dismiss Plaintiffs' Second Amended Complaint, arguing that Plaintiffs lack standing, the Court lacks subject-matter jurisdiction because there is no final agency action for the Court to review, and Plaintiff's First and Fourth Claims for Relief alleged in the Second Amended Complaint fail to state a claim upon which relief can be granted because they are time-barred.[1] For the reasons that follow, Defendants' motion to dismiss is denied.

## STANDARDS

### A. Article III Standing

The U.S. Constitution confers limited authority on the federal courts to hear only active cases or controversies brought with standing. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1546-47 (2016); *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 726 (2013). Standing "limits the category

---

[1] In their reply and at oral argument, Defendants raised additional arguments and asserted arguments against other causes of action. The Court, however, only considers arguments that Defendants present in their opening motion. *See Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010) (noting that "arguments raised for the first time in a reply brief are waived"); *United States v. Puerta*, 982 F.2d 1297, 1300 n.1 (9th Cir. 1992) ("New arguments may not be introduced in a reply brief.").

of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo*, 136 S. Ct. at 1547.

To have standing, a plaintiff must have a "personal interest . . . at the commencement of the litigation." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). The constitutionally required personal interest must satisfy three elements: (1) an injury-in-fact, *i.e.*, an invasion of a legally protected interest that is concrete and particularized, as well as actual or imminent; (2) a causal connection between the injury-in-fact and the defendant's challenged behavior; and (3) likelihood that the injury-in-fact will be redressed by a favorable ruling. *Id.* at 180-81, 189; *see also Spokeo*, 136 S. Ct. at 1547 (reiterating that the "irreducible constitutional minimum" of standing consists of "an injury in fact . . . fairly traceable to the challenged conduct of the defendant, and . . . likely to be redressed by a favorable judicial decision").

An injury is "particularized" if it "affect[s] the plaintiff in a personal and individual way." *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1 (1992)). An injury is "concrete" if it is "'*de facto*'; that is, it must actually exist," meaning that it is "'real' and not 'abstract.'" *Id.* "'Concrete' is not, however, necessarily synonymous with 'tangible.' Although tangible injuries are perhaps easier to recognize, [the Supreme Court has] confirmed in many . . . previous cases that intangible injuries can nevertheless be concrete." *Id.* at 1549.

Although Article III's injury requirement cannot be displaced by statute, when a statute creates a legal right, the invasion of that legal right may create standing. *See Spokeo*, 136 S. Ct. at 1549 (noting that Congress "is well positioned to identify intangible harms that meet minimum Article III requirements" and "has the power to define injuries and articulate chains of causation

that will give rise to a case or controversy where none existed before," but emphasizing that "Article III standing requires a concrete injury even in the context of a statutory violation"); *Edwards v. First Am. Corp.*, 610 F.3d 514, 517 (9th Cir. 2010) (noting that standing can exist by virtue of "statutes creating legal rights, the invasion of which creates standing"). When a person claims standing based on a violation of a statute, that person must also show that he or she has what has been variously referred to as "statutory standing," "prudential standing," or "zone of interest standing." *See generally Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386-88 (2014).

The relevant question for statutory standing in this case is whether the "statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Edwards*, 610 F.3d at 517. This can be established by pleading a violation of a right conferred by statute, provided the plaintiff alleges "a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). A "violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact. In other words, a plaintiff in such a case need not allege any *additional* harm beyond the one Congress has identified." *Spokeo*, 136 S. Ct. at 1549 (emphasis in original). A plaintiff cannot, however, "allege a bare procedural violation [of a statute], divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Spokeo*, 136 S. Ct. at 1549 (providing, by way of example of a procedural violation that would not likely present any material risk of harm, an allegation that a credit reporting agency disseminated a report containing an incorrect zip code). Additionally, in statutorily created causes of action, the plaintiff also must demonstrate that he or she is within the "zone of interests" protected by the law invoked in order to have standing to sue

for a violation of the statute. *See Lexmark*, 134 S. Ct. at 1388-89. Whether a plaintiff has stated a basis for statutory standing is generally tested under Rule 12(b)(6) of the Federal Rules of Civil Procedure, rather than Rule 12(b)(1). *See Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011).

**B. Motion to Dismiss Under Rule 12(b)(1)**

Federal courts are courts of limited jurisdiction. *Gunn v. Minton*, 133 S. Ct. 1059, 1064 (2013) (quotation marks omitted). As such, a court is to presume "that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted); *see also Robinson v. United States*, 586 F.3d 683, 685 (9th Cir. 2009); *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). A motion to dismiss under Rule 12(b)(1) for lack of "subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived." *United States v. Cotton*, 535 U.S. 625, 630 (2002). An objection that a particular court lacks subject-matter jurisdiction may be raised by any party, or by the court on its own initiative, at any time. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006); Fed. R. Civ. P. 12(b)(1). The Court must dismiss any case over which it lacks subject-matter jurisdiction. Fed. R. Civ. P. 12(h)(3).

A motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1) may be either "facial" or "factual." *See Safe Air for Everyone*, 373 F.3d at 1039. A facial attack on subject-matter jurisdiction is based on the assertion that the allegations contained in the complaint are insufficient to invoke federal jurisdiction. *Id.* "A jurisdictional challenge is factual where 'the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction.'" *Pride v. Correa*, 719 F.3d 1130, 1133 n.6 (9th Cir. 2013) (quoting *Safe Air for Everyone*, 373 F.3d at 1039)). When a defendant factually challenges the plaintiff's

assertion of jurisdiction, a court does not presume the truthfulness of the plaintiff's allegations and may consider evidence extrinsic to the complaint. *See Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1131 (9th Cir. 2012); *Robinson*, 586 F.3d at 685; *Safe Air for Everyone*, 373 F.3d at 1039. A factual challenge "can attack the substance of a complaint's jurisdictional allegations despite their formal sufficiency." *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir. 1996) (citation and quotation marks omitted).

## C.  Motion to Dismiss Under Rule 12(b)(6)

Lack of statutory standing requires dismissal for failure to state a claim. *See Maya*, 658 F.3d at 1067. A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). All reasonable inferences from the factual allegations must be drawn in favor of the plaintiff. *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need not, however, credit the plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

## D.  Mootness

A federal court does not have jurisdiction "to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895)). "A claim is moot if it has lost its character as a present, live controversy." *Rosemere Neighborhood Ass'n v. U.S. Envtl. Prot. Agency*, 581 F.3d 1169, 1172-73 (9th Cir. 2009) (quoting *Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1123 (9th Cir. 1997)). To determine mootness, "the question is not whether the precise relief sought at the time the application for an injunction was filed is still available. The question is whether there can be *any* effective relief." *Nw. Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244-45 (9th Cir. 1988) (quoting *Garcia v. Lawn*, 805 F.2d 1400, 1403 (9th Cir. 1986)) (emphasis in original). If a course of action is mostly completed but modifications can be made that could alleviate the harm suffered by the plaintiff's injury, the issue is not moot. *Tyler v. Cuomo*, 236 F.3d 1124, 1137 (9th Cir. 2000). A case becomes moot "only when it is impossible for a court to grant *any* effectual relief whatever to the prevailing party." *Chafin v. Chafin*, 133 S.Ct. 1017, 1023 (2013) (emphasis added) (citation omitted). The party alleging mootness bears a "heavy burden" to establish that a court can provide no effective relief. *Karuk*

*Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (quoting *Forest Guardians v. Johanns*, 450 F.3d 455, 461 (9th Cir. 2006)).

"Standing and mootness are similar doctrines: Both require some sort of interest in the case, and both go to whether there is a case or controversy under Article III." *Jackson v. Cal. Dept. of Mental Health*, 399 F.3d 1069, 1072 (9th Cir. 2005). The doctrines, however, have important differences—standing doctrine ensures that scarce judicial resources are devoted to disputes in which the parties have a concrete stake, and "[m]ootness issues arise later in the case, when the federal courts are already involved and resources have already been devoted to the dispute." *Id.* at 1072-73. That is why the Supreme Court recognizes exceptions to mootness that are not allowed as exceptions to standing, such as the exceptions for "voluntary cessation" and "capable of repetition, yet evading review." *See Laidlaw*, 528 U.S. at 189-90.

## BACKGROUND

### A. Statutory Background

Sections 515 and 521 of the Housing Act of 1949 ("Housing Act"), 42 U.S.C. §§ 1485, 1490a, provide for the development of low- and moderate-income housing in rural areas. This program was originally managed by USDA Farmers Home Administration, which was later incorporated into the Rural Housing Service. *See Schroeder v. United States*, 569 F.3d 956, 958-59 (9th Cir. 2009).

Under the Housing Act, owners of housing units are given government loans at favorable interest rates and other governmental subsidies in exchange for an agreement to rent units to qualified low-income, elderly, and disabled rural residents for the duration of the loan. Among other things, the housing program allows an "Interest Credit" subsidy, which reduces the interest rate on the loan to an effective rate of one percent. 42 U.S.C. § 1490a(a)(1)(B). Under the Interest Credit subsidy, owners establish a "basic rent" for each unit, which is generally less than

the market rate. Residents benefitting from the Interest Credit subsidy pay the *higher* of 30 percent of their income or the basic rent. 7 C.F.R. § 3560.203(a).

The housing program also provides a "Rental Assistance" subsidy. This is a subsidy passed through to low and very low income residents as lowered rent. The program allows such tenants to pay no more than 30 percent of their income for rent, regardless of the basic rent amount. 42 U.S.C. § 1490a(2)(A). RD enters into agreements with owners specifying the number of units in a development that will receive Rental Assistance. In GE, 19 of the 32 households receive the Rental Assistance subsidy, and the remaining households pay the higher of 30 percent of income or basic rent (the Interest Credit subsidy).

As originally drafted, property owners who developed rural low income housing had a contractual right to prepay their loans and leave the program, usually after a particular period of time, ending the borrower's obligation to rent to qualified individuals. *See Franconia Assocs. v. United States*, 536 U.S. 129, 135 (2002); *Airport Rd. Assocs., Ltd. v. United States*, 120 Fed. Cl. 706, 708 (2015). Concerned that the number of borrowers who were exercising their prepayment option was threatening the goals of the program, in 1979 Congress passed an amendment to the Housing Act that restricted certain prepayments to "to stem the loss of low-cost rural housing due to prepayments." *Franconia*, 536 U.S. at 135. In 1980, however, Congress again amended the Housing Act to remove any prepayment restrictions from loans made before December 21, 1979. *Id.* "By 1987, Congress had again become concerned about the dwindling supply of low- and moderate-income rural housing in the face of increasing prepayments of mortgages under § 515." *Id.* at 136. Thus, in 1988 Congress enacted ELIHPA, which "amended the Housing Act of 1949 to impose permanent restrictions upon prepayment of § 515 mortgages entered into before December 21, 1979." *Id.*

Under ELIHPA and its corresponding regulations, before the USDA can accept prepayment of a § 515 mortgage, it "shall make reasonable efforts to enter into an agreement with the borrower under which the borrower will make a binding commitment to extend the low income use of the assisted housing and related facilities for not less than the 20-year period beginning on the date on which the agreement is executed." 42 U.S.C. § 1472(c)(4)(A). ELIHPA provides that the government may include incentives to reach agreement with the borrower. *See Franconia*, 536 U.S. at 136 (citing § 1472(c)(4)(B)). If the borrower and the government cannot reach an agreement after a "reasonable period," the borrower seeking prepayment must "offer to sell the assisted housing and related facilities involved to any qualified nonprofit organization or public agency at a fair market value determined by 2 independent appraisers . . . ." 42 U.S.C. § 1472(c)(5)(A)(i). The government may accept prepayment if an offer to purchase by a qualified nonprofit organization or public agency is not made within 180 days, or may require refinancing in accordance with the statute. *See Franconia*, 536 U.S. at 137; *see also* 42 U.S.C. § 1472(c)(5)(A)(ii)).

## B. Regulatory Background

The regulations implementing the Housing Act and ELIHPA provide that the regulations' requirements "support the Agency's commitment to the preservation of decent, safe, sanitary, and affordable multi-family housing (MFH) for very low-, low-, and moderate-income households." 7 C.F.R. § 3560.651. The regulations, following the requirements in ELIHPA, provide that before accepting an offer to prepay from a borrower, the USDA must make a reasonable effort to enter into an agreement with the borrower to extend the low-income use of the property, offering appropriate incentives. *Id.* §§ 3560.655, 3560.656. If no agreement can be reached, the USDA can accept prepayment if: (1) the borrower agrees to sign restrictive-use provisions to extend restrictive use by 10 years from the date of prepayment and after those 10

years agrees to offer to sell the housing to a qualified nonprofit organization or public agency; or (2) "[i]f housing opportunities for minorities would be lost as a result of prepayment, the borrower will offer to sell the housing to a qualified nonprofit organization or public body." *Id.* § 3560.658(a).

If the borrower does not agree to either of those two options, then the USDA must "assess the impact of prepayment on two factors: housing opportunities for minorities and the supply of decent, safe, sanitary, and affordable housing in the market area." *Id.* § 3560.658(b). Earlier versions of the implementing regulations mirrored ELIHPA's text by requiring consideration of whether "housing opportunities for minorities will not be materially affected as a result of the prepayment . . . ." 7 C.F.R. Part 1965, Subpart B, Exhibit E, ¶ IV A.2 (1988). The rules were amended in 1990, but this provision was left unchanged.

In 2003, RD proposed new rules to consolidate and recodify many § 515 regulations. 68 Fed. Reg. 32872 (June 2, 2003). The draft proposed rules did not change the provision relating to consideration of the effect on minorities of prepayment. The interim final rules, however, significantly changed the provision. The interim final rule states in relevant part: "The Agency will review relevant information to determine the availability of comparable affordable housing for existing tenants in the market area and if minorities in the project, on the waiting list or in the market area will be *disproportionately adversely affected* by the loss of affordable rental housing units." 69 Fed. Reg. 69032, 69170 (Nov. 26, 2004) (now codified at 7 C.F.R. § 3560.658(b)) (emphasis added).

The USDA explained this change by stating that comments were received asking for additional information on how the determination of minority impact is reached. The Agency responded: "[t]he Agency agreed that 'adverse impact' needed further clarification and has

clarified that the adverse impact should be disproportionate. . . . Additional details on how the

Agency will review relevant information is available in Agency guidance about program

procedures." 69 Fed. Reg. 69032, 69094 (Nov. 26, 2004). A disproportionate adverse effect "is

defined as an impact predominately born by a minority or low-income population, is suffered by

the minority and/or low-income population, and is appreciably more severe or greater in

magnitude than what would be experienced by the non-minority or non low-income population."

USDA Nat'l Appeals Division, Appeals Determination, Case No. 2011E000625 (Sept. 12, 2011)

(citing USDA Administrative Notice 4501, Att. 2, Question 5).[2]

    The "additional details" referenced in the rule are contained in Exhibit E of RD

Instruction 1965, Subpart E, titled "Administrative Guidance for Making Prepayment

Determinations" ("Exhibit E").[3] Exhibit E provides that the analysis regarding the adverse effect

on minorities must address and document: (1) the percentage of minorities in the prepaying

project and in the project's market area to which displaced residents are likely to move; (2) the

impact of potential prepayment on minority residents in the project and in the market area;[4]

(3) the vacancies and length of waiting lists at the prepaying project and in projects with similar

minority concentrations in the geographic area of the prepaying project; and (4) whether the

---

[2] *Available at* https://usda-nad-local1.entellitrak.com/etk-usda-nad-prod-temp/page.request.do?page=page.highlightedFile&id=64119&query_text=&query_text2=&citation= (last visited on January 29, 2018).

[3] These considerations were originally included as a proposed rule, but ultimately were not included in the regulation. *See* 55 Fed. Reg. 29601, 29619 (July 20, 1990) (Proposed § 1965.215(b)(2)).

[4] If either the project or market area is an area of minority concentration, the agency must determine whether minority tenants and members of the community will be forced to move to areas with traditional discrimination practices. If both the project and market areas do not have minority concentration, the agency must determine whether minorities will be forced to move to an area of minority concentration if the subject housing is prepaid.

prepayment will negatively affect the opportunity for decent, safe and sanitary, and affordable housing of minority residents in the community who do not currently live at the project. Exhibit E was published internally in RD Instructions and forwarded to all field offices in 2003.

Thus, the USDA now reviews whether minorities will be disproportionately adversely affected by the loss of the affordable rental housing unit. If the USDA "determines that prepayment will have an adverse impact on minorities, then the borrower must offer to sell to a qualified nonprofit organization or public body." *Id.* § 3560.658(b)(2). If the USDA "determines that the prepayment will not have an adverse effect on housing opportunities for minorities" and "there is not an adequate supply of decent, safe, and sanitary rental housing affordable to program eligible tenant households in the market area, the loan may be prepaid only if the borrower agrees to sign restrictive-use provisions . . . to protect tenants at the time of prepayment." *Id.* § 3560.658(b)(3). If the USDA "determines that there is no adverse impact on minorities and there is an adequate supply of [affordable] decent, safe, and sanitary rental housing," then prepayment can be accepted without further restrictions. *Id.* § 3560.658(b)(4).

Within 30 days of receiving a completed prepayment request, the USDA must send a prepayment request notice to each tenant, and borrowers must post the prepayment request notice in the public areas of the housing project from the date of the notice through final resolution of the prepayment request. The notice must state a date and place when and where tenants can meet with USDA personnel and must advise tenants that they may review all information submitted except the borrower's financial information and that they have 30 days from the date of the prepayment request to submit comments. *Id.* § 3560.654. After the USDA agrees to accept prepayment, it must then notify borrowers in writing of the conditions under which it accepts prepayment, including the specific restrictive-use provisions to which the borrower has agreed.

*Id.* § 3560.660(a). The USDA must notify tenants if the prepayment is expected to result in increased net tenant contributions, displacements, or involuntary relocations and notify tenants of their right to request a Letter of Priority Entitlement ("LOPE"). *Id.* § 3560.660(b).

## C. Factual and Procedural Background of this Case

The loan for the development of GE was made in 1976, with a repayment term of 50 years. The loan may be prepaid, but only under the conditions set forth in ELIHPA. On June 22, 2015, RD sent a notice of prepayment letter to all GE tenants, explaining that GE's owner has requested permission to prepay the loan. ECF 23-1. The notice informed tenants that it was unclear whether GE would remain affordable housing, that rents could be increased, and that RD could determine that prepayment would require certain tenant protections.

On September 19, 2016, RD sent to GE's owner a letter confirming acceptance of prepayment on GE's financing, with conditions. ECF 23-2 at 1-5. This letter explained that RD had concluded from its "needs and impact analysis" that the proposed prepayment will not cause any adverse impact to minorities, but that there is an insufficient supply of affordable housing in the market area and thus the prepayment will be accepted with the condition of a Restrictive Use Covenant, which was attached. *Id.* at 1. This acceptance letter further explained the timing requirements for payment and that certain previously-identified repairs would need to be completed before prepayment. *Id.* at 1-2.

Also on September 19, 2016, RD sent a notice to GE tenants that RD had accepted the owner's prepayment request. ECF 23-2 at 6-8; *see also* ECF 23-3. This notice informed tenants that rents may be increased in the future, that the owner could not evict tenants without good cause, and that tenants could enforce the legal agreement made by the owner. The tenants also were notified that they may be eligible for a USDA Voucher to provide short-term rental subsidy to supplement the rent payment and allow tenants to remain in GE or move elsewhere. The

notice also attached a document informing tenants that they may apply for a LOPE and may be eligible for an RD Voucher because "rents may increase thereby making the housing unaffordable to tenants." ECF 23-2 at 8.

Plaintiffs filed this lawsuit on November 4, 2016. On November 23, 2016, Plaintiffs filed an amended complaint and moved for a preliminary injunction. The Court set a hearing date of January 4, 2017, on Plaintiffs' motion. Several days before the hearing, the Court sent the parties the Court's tentative Opinion and Order granting Plaintiff's motion. At the hearing, Defendants stated that RD had decided voluntarily to rescind its approval of the prepayment request for GE's loan. Defendants acknowledged that there were flaws in its analysis in CRIA I and that RD would perform a new CRIA. Thus, Defendants argued, the preliminary injunction the Court had tentatively indicated it would order was no longer needed because the prepayment could no longer move forward until the new CRIA was completed. The Court agreed and denied Plaintiffs' motion without prejudice. The Court, however, ordered that Defendants could not accept any prepayment on GE without giving Plaintiffs 60 days' notice. The Court also ordered Defendants to comply with all statutory and regulatory notice requirements, so that Plaintiffs could timely renew their motion for preliminary injunction, if needed. ECF 30.

RD conducted its second CRIA, after which RD concluded that prepayment would have a disproportionate effect on minority housing. ECF 38-1. Accordingly, RD required GE's owner to offer GE for sale to a nonprofit or public agency for a period of 180 days. On or about May 11, 2017, GE's owner advised RD that it would comply with RD's decision and offer the development for sale after an appraisal of the property had been completed. ECF 49 ¶ 22.

There are five additional RD § 515 rental housing developments in Tillamook County. There is a 12-unit family development with all units subsidized with Rental Assistance; a 34-unit

elderly development with 19 of the units subsidized with Rental Assistance; a 32-unit family

development with 20 of the units subsidized with Rental Assistance; a 30-unit family

development with all the units subsidized with Rental Assistance; and a 17-unit elderly

development with 16 of the units subsidized with Rental Assistance. The loans for at least three

of these developments are currently eligible for prepayment.

## DISCUSSION

In their motion to dismiss, Defendants argue that Plaintiffs do not have standing because

they do not allege sufficient facts showing injury from the regulations or alleged agency

practices. Defendants also argue that the Court lacks jurisdiction because there has been no final

agency action, which is a jurisdictional prerequisite to claims under the APA. Finally,

Defendants argue that Plaintiffs' first and fourth causes of action are time-barred because the

regulations that Plaintiffs challenge were issued more than six years ago.

Plaintiffs respond by arguing primarily that this case is justiciable for three reasons. First,

the issue now before the court is one of mootness and not standing, which presents a higher

burden for Defendants that has not been met. Second, RD's initial approval of CRIA I constitutes

final agency action sufficient to allow suit under the APA, as does the issuance of CRIA II.

Third, the first and fourth claims are not barred by the statute of limitations because the

challenges are "as-applied" challenges, rather than "facial" challenges and thus the statute of

limitations begins when the regulation has been applied, not when it was promulgated.

## A. Standing

Plaintiffs assert that they had standing when this case was originally filed, that standing is

considered as of the filing of the original complaint, and that Defendants' arguments relating to

RD's rescission of the prepayment approval go to mootness and not standing. Defendants do not

dispute these points, and instead argue that Plaintiffs' mootness-versus-standing argument is a

distinction without a difference. Defendants contend that regardless of whether the Court considers the issue to be a question of mootness or standing, Plaintiffs cannot maintain their claims. The majority of Defendants' arguments, however, challenge Plaintiffs' standing, based on the facts as they exist as of the filing of the Second Amended Complaint.

As an initial matter, the Court agrees with Plaintiffs that Article III standing is evaluated by considering the facts as they existed at the time of the commencement of the action. *See Laidlaw*, 528 U.S. at 180 (noting that "we have an obligation to assure ourselves that FOE had Article III standing at the outset of the litigation"); *Barry v. Lyon*, 834 F.3d 706, 714 (6th Cir. 2016) ("To uphold the constitutional requirement that federal courts hear only active cases or controversies, as required by Article III, section 2 of the federal constitution, a plaintiff must have a personal interest at the commencement of the litigation (standing) that continues throughout the litigation (lack of mootness)."); *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 838 (9th Cir. 2007) ("The existence of standing turns on the facts as they existed at the time the plaintiff filed the complaint."); *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1275 (11th Cir. 2003) ("Importantly, in reaching this [standing] determination, we note that Article III standing must be determined as of the time at which the plaintiff's complaint is filed."); *Cleveland Branch, NAACP v. City of Parma*, 263 F.3d 513, 524 (6th Cir. 2001) ("[S]tanding does not have to be maintained throughout all stages of litigation. Instead it is to be determined as of the time the complaint is filed."); *Becker v. Fed. Election Comm'n*, 230 F.3d 381, 386 n.3 (1st Cir. 2000) (noting that *Lujan* "clearly indicat[es] that standing is to be 'assessed under the facts existing when the complaint is filed'" and that evaluating standing when facts later change "conflates questions of standing with questions of mootness: while it is true that a plaintiff must have a personal interest at stake throughout the

litigation of a case, such interest is to be assessed under the rubric of standing at the commencement of the case, and under the rubric of mootness thereafter"); *White v. Lee*, 227 F.3d 1214, 1243 (9th Cir. 2000) ("Standing is examined at 'the commencement of the litigation.'"); *Wadsworth v. Talmage*, 2017 WL 3271722, at *3 (D. Or. Aug. 1, 2017) (noting that standing turns on the facts as of the time of the original complaint, except when the court had allowed a supplemental complaint under Rule 15(d) of the Federal Rules of Civil Procedure to correct a defective complaint and circumvent the unnecessary steps of dismissal of one action and the filing of a new action); *Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Engineers*, 2013 WL 1294647, at *7-8 (D. Or. Mar. 27, 2013) (rejecting the defendant's arguments that standing should be considered based on the facts at the time of the second amended complaint, when the government had voluntarily disbanded the challenged conduct, discussing the difference between standing and mootness); *see also Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91-93 (2013) (noting that both parties had standing "[a]t the outset of this litigation" but that after Nike dismissed its claims with prejudice, the issue became one of mootness, and then analyzing the voluntary cessation exception to mootness).

The Court holds that Plaintiffs had standing at the time they commenced the action. Thus, the relevant question is whether the issuance of CSRIA II or the rescission of the prepayment agreement has rendered the case moot.

## B. Mootness

Plaintiffs argue that none of Defendants' actions after the filing of this case have mooted Plaintiffs' claims that the implementing regulations on CRIAs violate the APA because they are inconsistent with the governing statute and result in arbitrary and capricious prepayment determinations, that the voucher program violates the APA because it is arbitrary and capricious, and that the regulations authorizing the termination of use restrictions violates ELIHPA.

Plaintiffs also argue that even if their claims were rendered moot, they are subject to the exception to mootness of voluntary cessation.

Defendants respond that mootness is the doctrine of standing at a certain point in time, Plaintiffs no longer have standing, and thus the case is moot. This argument, however, has been rejected by the Supreme Court. In *Laidlaw*, the Supreme Court explained in detail why the description of mootness as "standing set in a time frame"[5] is not comprehensive—primarily because of the exceptions to mootness that are not available in considering standing. 528 U.S. at 190-92. The voluntary cessation exception to mootness, argued by Plaintiffs as applying in the pending case, is one of the exceptions discussed by the Supreme Court in *Laidlaw*.

The Court assumes without deciding that Defendants' conduct in rescinding its approval of GE's prepayment, withdrawing CRIA I, and issuing CRIA II, has mooted Plaintiffs' original claims. The Court now considers Plaintiffs' argument that the voluntary cessation exception to mootness applies. The Supreme Court has explained the voluntary cessation exception as follows:

> It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. Such abandonment is an important factor bearing on the question whether a court should exercise its power to enjoin the defendant from renewing the practice, but that is a matter relating to the exercise rather than the existence of judicial power.

---

[5] In *Laidlaw*, the Supreme Court explained courts' previous reliance on this description: "The confusion is understandable, given this Court's repeated statements that the doctrine of mootness can be described as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).' *Arizonans for Official English*, 520 U.S. [43,] 68 n.22 [1997] (quoting *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980), in turn quoting Monaghan, Constitutional Adjudication: The Who and When, 82 Yale L.J. 1363, 1384 (1973) (internal quotation marks omitted)." *Laidlaw*, 528 U.S. at 189-90.

*City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). As the Supreme Court

further explained, in a footnote:

> "The test for mootness in cases such as this is a stringent one. Mere
> voluntary cessation of allegedly illegal conduct does not moot a
> case; if it did, the courts would be compelled to leave '[t]he
> defendant . . . free to return to his old ways.' A case might become
> moot if subsequent events made it absolutely clear that the
> allegedly wrongful behavior could not reasonably be expected to
> recur. . . . Of course it is still open to appellees to show, on
> remand, that the likelihood of further violations is sufficiently
> remote to make injunctive relief unnecessary. This is a matter for
> the trial judge. But this case is not technically moot, an appeal has
> been properly taken, and we have no choice but to decide it."

*Id.* n.10 (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203-04

(1968) (alterations in original) (citations omitted); *see also Laidlaw*, 528 U.S. at 189 (describing

the voluntary cessation exception, citing to *City of Mesquite* and *Concentrated Phosphate*).

Defendants voluntarily ceased part of the alleged wrongful conduct—the approval of

prepayment of the loan on GE and reliance on the allegedly improper CRIA I. But Defendants

did not cease much of the alleged wrongful conduct—retaining allegedly improper regulations,

failing to have standards that result in allegedly arbitrary and capricious analyses, and operating

an allegedly arbitrary and capricious voucher program. For example, RD has not changed its

regulations more closely to mirror the statutory text with respect to CRIAs, as Plaintiffs allege it

should with respect to evaluating the effect on minority housing. Instead, when faced with the

Court's tentative decision on Plaintiff's motion for preliminary injunction, RD decided to

withdraw its particular CRIA relating to a single property, reissue that CRIA, and then rescind

the prepayment approval on that one property. Changing that single decision, however, does not

change the underlying wrongful conduct that Plaintiffs' allege resulted in that allegedly wrongful

decision, which Defendants appear to have conceded was a wrongful decision when they

rescinded that action.

RD voluntarily agreed to reconsider its CRIA and prepayment approval relating to GE. RD did not, however, change any policy or make any procedural changes to the regulations and procedures challenged by Plaintiffs. The Ninth Circuit has found that "an executive action that is not governed by any clear or codified procedures cannot moot a claim" and falls within the voluntary cessation exception. *McCormack v. Herzog*, 788 F.3d 1017, 1025 (9th Cir. 2015). Even if RD's reconsideration of GE's CRIA indicates some intention of changing its policy going forward, without a more rigorous policy statement or change to its regulations, the Ninth Circuit advises courts to be "less inclined to find mootness where the 'new policy . . . could be easily abandoned or altered in the future.'" *Rosebrock v. Mathis*, 745 F.3d 963, 972 (9th Cir. 2014) (finding that this type of conduct falls within the voluntary cessation exception).

Defendants' voluntary cessation may have rendered certain aspects of Plaintiffs' originally-alleged harm no longer imminent (such as facing higher rents and eviction at GE), but Defendants have a "heavy burden" to show that it is "absolutely clear" that their allegedly wrongful behavior "could not reasonably be expected to recur." *Laidlaw*, 528 U.S. at 189 (quoting *Concentrated Phosphate*, 393 U.S. at 203). This alleged wrongful behavior includes, for example, conducting CRIAs using an improper standard or operating an improper voucher program. Because the same regulations and procedures (or lack thereof) are still in place, the allegedly wrongful behavior can reasonably be expected to recur.

Defendants argue that their allegedly wrongful conduct of performing improper CRIAs or implementing improper voucher programs cannot serve to keep this case a live case or controversy because it cannot harm Plaintiffs. Defendants contend that although Plaintiffs assert there are other low income properties in Tillamook County that are eligible for prepayment, Plaintiffs "provide no evidence" that any other property is currently in the prepayment process,

other than GE. Defendants also assert that whether the Individual Plaintiffs will need vouchers will not be known until after it is known whether GE is purchased by a nonprofit organization and retained as low income housing or allowed to be prepaid without use restrictions (after the 180-day waiting period expires). Even if the GE loan becomes eligible for prepayment, Defendants argue that it will still be speculative as to whether any particular Individual Plaintiff will need a voucher. Thus, argue Defendants, even if Defendants improperly perform some of the functions within the prepayment or voucher process, any argument that such impropriety would harm Plaintiffs is speculative.

The Ninth Circuit rejected similar arguments in *Rosemere Neighborhood Ass'n v. U.S. Envtl. Prot. Agency*, 581 F.3d 1169 (9th Cir. 2009). In *Rosemere*, the plaintiff originally sought a declaration that the EPA was not timely considering administrative complaints and an injunction compelling the EPA to complete its investigation into an underlying administrative complaint brought by the plaintiff. *Id.* at 1171. After the lawsuit was filed, the EPA completed its investigation and argued that the lawsuit was moot. The plaintiff filed an amended complaint and sought an injunction requiring that the EPA consider all of the plaintiff's administrative complaints going forward for the next five years within the deadlines required by the EPA's governing regulations. *Id.* at 1172. The district court dismissed the plaintiff's claims as moot. The plaintiff argued that the claims were subject to the voluntarily cessation exception to mootness. The EPA argued that because no other administrative complaints were pending, the prospect that there would be any new administrative complaint by the plaintiff and that adjudication of any new administrative complaint would be delayed was speculative. *Id.* at 1173. The Ninth Circuit rejected this argument, noting that it impermissibly shifted the burden onto the plaintiff to prove that it would file a new administrative complaint when the "heavy burden" is

on the defendant (the party arguing mootness) to show that the plaintiff would *not* file a new complaint in the future, and that the defendant could not meet this burden by merely arguing that the plaintiff had not done enough to show future harm. *Id.* at 1173-74. The Ninth Circuit also noted that a plaintiff's stated intention to resume the activity that led to litigation is sufficient. *Id.* at 1174.

Plaintiffs argue in their response that if RD does not change its allegedly improper regulations or start using proper prepayment standards of review, RD will continue to violate ELIHPA, which "will continue to frustrate CARE's mission and increase CARE's financial and personnel burdens in Tillamook County. . . . CARE will have to spend more time assisting its clients in finding affordable housing, *challenging RD's illegal acceptance of prepayment requests*, and providing additional financial assistance." ECF 57 at 9 (emphasis added). Additionally, at oral argument counsel for CARE confirmed that CARE would continue to file lawsuits in the future if additional properties receive prepayment approval. This is a sufficient stated intention to resume activities by Plaintiff to satisfy the requirements set by the Ninth Circuit. *Rosemere*, 581 F.3d at 1174; *S. Or. Barter Fair v. Jackson Cty.*, 372 F.3d 1128, 1134 (9th Cir. 2004).

The "heavy burden" is on Defendants to show that it is "extremely unlikely" that the Individual Plaintiffs will not be subject to RD's voucher program and that CARE will not file a future lawsuit. *Rosemere*, 581 F.3d at 1173 (stating that one way the defendant could meet its burden of showing that it is "absolutely clear" that the challenged conduct would not reoccur is "by showing that it is extremely unlikely that Rosemere will file another complaint (and thus come before the agency again)" and the other is to show that the agency would timely respond to any future complaint). Defendants have submitted a declaration from J. Wesley Cochran, the

Multi-Family Housing Program Director from the Oregon State Office of Rural Development, stating that he is aware of all prepayment applications for § 515 properties and that there are no pending applications for prepayment within Tillamook County other than for GE. The fact that no applications are currently pending, however, is insufficient evidence standing alone. In *Rosemere*, there were no pending administrative complaints by the plaintiff, but that was insufficient to show that there would not be a future complaint. 581 F.3d at 1172-73. Further, in *Barter Fair*, the plaintiff hoped to obtain funding at some point in the future to hold another fair, even though it had not been able to raise sufficient funds for many years, and the Ninth Circuit found the prospect of a future fair not to be too speculative because the barriers were not "insurmountable." 372 F.3d at 1134. Similarly, it is not an insurmountable hurdle or extremely unlikely that a property in Tillamook County will seek repayment in the future and CARE will challenge the RD's process for considering such a repayment.

Defendants offer no evidence regarding the future applicability of the voucher program to Plaintiffs, which is unknown until the 180-day waiting period expires on or about April 17, 2018. At oral argument, counsel for Plaintiffs noted that the voucher program has run out of funding for the past several years and that the funding in the most recent budget proposed by Congress (though not yet approved) was significantly decreased. Thus, argue Plaintiffs, it is a near certainty that the voucher program will run out of funds. Plaintiffs also contend that voucher funds are being mishandled and distributed in a manner contrary to the statute, which harms all Plaintiffs because it results in monies not being available that otherwise would be available to program participants. At this stage in the proceedings, Defendants have not met their "heavy burden" of showing that it is "absolutely clear" that the alleged wrongful conduct cannot reoccur.

Defendants also cite to *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009), and *Cierco v. Mnuchin*, 857 F.3d 407 (D.C. Cir. 2017), to support their argument that Plaintiffs' claims are moot. Defendants' reliance on *Summers* is misplaced. In *Summers*, the Supreme Court held that the plaintiffs could not continue litigating whether agency regulations were improper after the parties *settled* their underlying dispute on a timber sale, which was the only application of the regulations that gave the plaintiffs standing in the case. 555 U.S. at 494 ("We know of no precedent for the proposition that when a plaintiff has sued to challenge the lawfulness of certain action or threatened action but has *settled* that suit, he retains standing to challenge the basis for that action (here, the regulation in the abstract), apart from any concrete application that threatens imminent harm to his interests." (emphasis added)). That case did not involve the voluntary cessation exception to mootness because it involved a completely different context— the parties had settled their dispute.  In the pending action, the parties have not settled their dispute. Defendants' reliance on *Cierco* is similarly unavailing because *Cierco*, like *Summers*, did not involve the voluntary cessation exception to mootness. The concerns giving rise to the voluntary cessation exception (that a defendant might voluntarily cease the challenged conduct to avoid judicial scrutiny but would later return to its wrongful ways after the case ended) were not present in *Ciero* or *Summers*.

Defendants' remaining arguments relate to standing, instead of mootness. Defendants argue the implications of facts as they exist at the time of Plaintiffs' filing of the Second Amended Complaint and assert that those facts demonstrate that Plaintiffs lack standing. As discussed earlier, however, that is not the proper analysis. Standing is determined based on the facts that existed when the action was commenced.

### C. Final Agency Decision

The Supreme Court has reiterated the standards for evaluating whether an agency decision is "final" under the APA. In *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807 (2016), the Supreme Court explained that there are "two conditions that generally must be satisfied for agency action to be 'final' under the APA." *Id.* at 1813. The first is that "the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Id.* (quoting *Bennett v. Spear,* 520 U.S. 154, 177-78 (1997)). The second is that "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (quoting *Bennett*, 520 U.S. at 178).

Defendants argue that CRIA II is not a final agency decision because denying prepayment under CRIA II does not end the decisionmaking process. First, the Court notes that the final agency decision originally challenged in this lawsuit is CRIA I. The subsequent conduct, the issuance of CRIA II, may be relevant for mootness purposes, but the Court has found that it did not serve to moot Plaintiffs' claims.

Second, even if CRIA II were the relevant agency decision, it is a final agency decision. Defendants assert that based on RD's decision in CRIA II and the requirement that GE be offered for sale, if an offer is made, the agency will have to make further decisions. Defendants contend that these additional decisions include whether the offer offeror qualifies as a "nonprofit organization or public agency" under 42 U.S.C. § 1472(c)(5)(B)(i)-(ii) and whether an offer is bona fide.[6] If an offer is found to be bona fide and from a qualified offeror, then GE's owner

---

[6] Defendants do not cite to any statute or regulation defining "bona fide" or discussing RD's authority or process to determine a bona fide offer. The regulation governing these types of offers does not use the term "bona fide," but instead discusses the process for obtaining market value appraisals and the requirement to inform nonprofit and public agency purchasers of the "minimum value of the housing project based on the market value determined in accordance" with those appraisals. 7 C.F.R. § 3560.659(b)(3).

must accept the offer or withdraw the request for prepayment. If there is no bona fide offer from a qualified offeror, then GE's owner can prepay the loan without any restrictions. Thus, argue Defendants, RD's final agency decision has not yet been made.

Plaintiffs argue that CRIA II is a final agency decision because it is not a tentative decision or interlocutory decision, it is a decision from which rights and obligations were determined. Plaintiffs assert that in CRIA II, RD determined that GE's owner's prepayment requested materially affected minority housing and thus could not be accepted unless GE's owner first offered the property for sale to nonprofit and public agencies, and RD then required GE's owner to offer the property for sale. Plaintiffs argue that any remaining agency decisions are "administrative" and that the primary substantive decision has already been made that affects the rights of the parties. Defendants respond that whether the GE loan can be prepaid, and thus whether the tenants of GE (including the Individual Plaintiffs) will be subject to the voucher program, are decisions that have not yet been made because they hinge on whether a bona fide offer from a qualified offeror is submitted, and thus the remaining decisions are not merely administrative.

Although there may be outstanding issues, the important ones do not turn on discretionary agency decisionmaking. They turn on the decisions of outside parties—whether any nonprofit organization or governmental agency decides it wants to purchase GE. The only agency decisionmaking left is to determine, if an offer is made, whether the offeror meets the criteria for "nonprofit organization or public agency." If no offer is made, the agency determines whether to accept prepayment or refinancing. The Court finds that these decisions are more ministerial than substantive. The agency has regulations setting forth the criteria for an eligible nonprofit organization and how to prioritize if multiple nonprofit organizations or public bodies

make offers. 7 C.F.R. § 3560.659.  The agency decision from which most of the rights and obligations were determined, and legal consequences flowed, was CRIA II. Notably, GE's owner had the right to administratively appeal the determination of CRIA II. If it was not a decision from which rights were determined and legal consequences flowed, GE's owner would not have had needed the right to appeal it.

Additionally, if no offers are received, the agency has no substantive decision left to make. Defendants do not argue that there is any decisionmaking remaining by the agency if no offers are submitted. Thus, CRIA II would be a final agency decision if no offer is received. It would be anomalous, to say the least, to conclude CRIA II is a final agency decision if no offer is received but is not a final agency decision if an offer were to be received, making whether it is a final agency decision turn on something that might occur 180 days after the decision is made and based on matters entirely outside of the control of the agency.[7]

Defendants' reliance on *DBSI/TRI IV Ltd. Partnership v. United States*, 465 F.3d 1031 (9th Cir. 2003), also is unavailing. *DBSI/TRI IV* held that a case is not ripe "where the existence of the dispute itself hangs on future contingencies that may or may not occur." *Id.* at 1039. In the pending case, the existence of the dispute does not depend on a future contingency. Plaintiffs' claims relating to Defendants' alleged improper CRIA procedures and termination of use restrictions do not hang on whether there are or are not any bona fide offers by qualified offerors (the only remaining "decisions" Defendants argue are left for the agency to make). Although Plaintiffs' standing relating to their voucher claim requires a prepayment approval decision, as discussed above, standing is determined as of the commencement of the action, which was based

---

[7] Under Defendants' argument, the Court would need to stay deciding this motion until after the 180-day waiting period, and if no offer is made then CRIA II would become a final agency decision and Defendants' motion on this ground would be rendered moot.

on CRIA I. Defendants' argument that the voucher-based claim has become moot is rejected by the Court, as discussed earlier. Regardless, Defendants' mootness argument does not determine whether CRIA II is a final agency decision.

## D. Timeliness

Defendants argue that Plaintiffs' first and fourth claims are time-barred because Plaintiffs assert that regulations 7 C.F.R. §§ 3560.662(f) and 3560.658(b) are improper, but those regulations were promulgated more than six years ago. Plaintiffs respond that they are making an "as applied" challenge and thus the six-year limitation has not run. Defendants argue Plaintiffs cannot be making an "as applied" challenge because CRIA II found that GE's prepayment materially affected minority housing and thus the agency action was not an adverse application of the regulation to Plaintiffs. Again, Defendants are confusing what facts the Court considers.

For standing and timeliness, the Court looks to the facts as they existed at the time the lawsuit was commenced. *See* cases cited in Section A, *supra*. In the pending case, those facts included CRIA I and the agency's finding of no material effect on minority housing and its approval of GE's prepayment offer. That was an adverse application of the challenged regulations to Plaintiffs. It is thus an "as applied" challenge and these claims are not time-barred under the applicable statute of limitations. *See Wind River Mining Corp. v. United States*, 946 F.2d 710, 715 (9th Cir. 1991) (noting that a plaintiff may challenge "the substance of an agency decision as exceeding constitutional or statutory authority . . . later than six years following the decision by filing a complaint for review of the adverse application of the decision to the particular challenger"); *Coal. for a Sustainable Delta v. Fed. Emergency Mgmt. Agency*, 812 F. Supp. 2d 1089, 1106 (E.D. Cal. 2011) (noting that one way a plaintiff can substantively challenge the validity of a regulation after the six-year statute of limitations has run is "through

an 'as applied' challenge requesting judicial review of the agency's adverse application of the rule to the particular challenger" (quotation marks omitted)).

Mootness is a different question. Because the Court has concluded that the voluntary cessation exception applies, as discussed earlier, Plaintiffs' claims are not moot and, for the same reasons, have not been rendered untimely by Defendants' conduct subsequent to the filing of the lawsuit.

## CONCLUSION

Defendants' Motion to Dismiss the Second Amended Complaint (ECF 53) is DENIED.

**IT IS SO ORDERED**.

DATED this 8th day of February, 2018.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge